Ruwe, Judge: Respondent determined a $30,911 deficiency, a $6,583 addition to tax under section 6651(a)(1)[1] for failure to timely file, and a $6,182.20 accuracy-related penalty under section 6662(a) in regard to petitioners’ 2001 Federal income tax. The issues we must decide are: (1) Whether a transaction in which Albert L. Calloway (petitioner) transferred 990 shares of International Business Machines Corp. (IBM) common stock to Derivium Capital, L.L.C. (Derivium), in exchange for $93,586.23 was a sale or a loan; (2) whether the transaction qualifies as a securities lending arrangement; (3) whether petitioners are liable for an addition to tax under section 6651(a)(1) for failure to timely file; and (4) whether petitioners are liable for an accuracy-related penalty pursuant to section 6662(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Georgia. After petitioner graduated from college in 1964, he began a successful career with IBM. While employed at IBM petitioner purchased shares of IBM stock. During 2001 petitioner’s financial adviser, Bert Falls, introduced him to Derivium and its 90-percent-stock-loan program.[2] Under that program Derivium would purport to lend 90 percent of the value of securities pledged to Derivium as collateral. Derivium was not registered with the New York Stock Exchange or the National Association of Securities Dealers/Financial Industry Regulatory Authority. Charles D. Cathcart was president of Derivium. On or about August 6, 2001, Derivium sent to petitioner a document entitled “Master Agreement to Provide Financing and Custodial Services” (master agreement) with attached “Schedule D, Disclosure Acknowledgement and Broker/Bank Indemnification” (schedule D). The master agreement provides, in pertinent part: This Agreement is made for the purpose of engaging * * * [Derivium] to provide or arrange financing(s) and to provide custodial services to * * * [petitioner], with respect to certain properties and assets (“Properties”) to be pledged as security, the details of which financing and Properties are to be set out in loan term sheets and attached hereto as Schedule(s) A (“Schedule(s) A”). The schedule D to be executed in connection with the master agreement states that the transaction was to “Provide Financing and Custodial Services entered into between Derivium * * * and * * * [petitioner]”. Paragraph 3 of schedule D, relating to the pledge of securities, provides, in pertinent part: [Petitioner] understands that by transferring securities as collateral to * * * [Derivium] and under the terms of the * * * [master agreement], * * * [petitioner] gives * * * [Derivium] the right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, and/or sell outright some or all of the securities during the period covered by the loan. * * * [Petitioner] understands that * * * [Derivium] has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the term of a loan. * * * [Emphasis added.] Derivium also sent to petitioner a document entitled “Schedule A-l, Property Description and Loan Terms” (schedule A-l), which sets forth the essential terms of the transaction. Schedule A-l provides: This Schedule A * * *, dated August 6th, 2001, is executed in connection with the Master Agreement to Provide Financing and Custodial Services entered into between Derivium * * * and [petitioner] * * * on 8/6/01. 1. Property Description: 990 shares of International Business Machines Corporation (IBM). 2. Estimated Value: $105,444.90 (as of 8/6/01, at $106.51 per share). 3. Anticipated Loan Amount: 90% of the market value on closing, in part or in whole. 4. Interest Rate: 10.50%, compounded annually, accruing until and due at maturity. 5. Cash vs. Accrual: All Dividends will be received as cash payments against interest due, with the balance of interest owed to accrue until maturity date. 6. Term: 3 years, starting from the date on which final loan proceeds are delivered on the loan transaction. 7. Amortization: None. 8. Prepayment Penalty: 3 year lockout, no prepayment before maturity. 9. Margin Requirements: None, beyond initial collateral. 10. Non-Callable: Lender cannot call loan before maturity. 11. Non-Recourse: Non-recourse to borrower, recourse against the collateral only. 12. Renewable: The loan may be renewed or refinanced at borrower’s request for an additional term, on the maturity date, within * * * [Derivium’s] prevailing conditions and terms for loans at the time of renewal or refinancing. On the renewal or refinancing of any loan for which 90% of the collateral value at maturity does not equal or exceed the payoff amount, there will be a renewal fee, which will be calculated as a percentage of the balance due at maturity of this loan. The percentage will vary according to the market capitalization of the securities at the time of the renewal or refinancing, as follows: Large Caps at 4.5%, Mid Caps at 5.5%, Small Caps at 6.5%. 13. Closing: Upon receipt of securities and establishment of * * * [Derivium’s] hedging transactions. Before entering into the agreement with Derivium, petitioner reviewed a memorandum dated December 12, 1998, from Robert J. Nagy, who claimed to be a certified public accountant, to Mr. Cathcart regarding the “Tax Aspects of First Security Capital’s 90% Stock Loan” that was requested by Mr. Cathcart. In the memorandum Mr. Nagy describes a potential client as one who owns publicly traded stock with a low basis, which if sold would result in significant gain to the client. Mr. Nagy describes the primary issue as whether the 90-percent-stock-loan transaction is a sale or a loan and opines that, although there is no “absolute assurances that the desired tax treatment will be achieved”, there is a “solid basis for the position that these transactions are, in fact, loans.” Petitioner relied on Mr. Nagy’s memorandum to Mr. Cathcart in deciding whether to enter into the agreement. Petitioner testified that a loan versus a sale transaction made economic sense to him because the loan proceeds given to him were 90 percent of the value of the IBM stock whereas if he had sold the stock he would have had to pay 20 percent for taxes. Petitioner decided to enter into the 90-percent-stock-loan program (transaction) with Derivium. Petitioner signed the master agreement, the schedule D, and the schedule A-l on August 8, 2001. Charles D. Cathcart, as president of Derivium, signed the master agreement and the schedule A-1 on August 10, 2001. On or about August 9, 2001, petitioner instructed Brian J. Washington of First Union Securities, Inc., to transfer 990 shares of IBM common stock (IBM stock or collateral) to Morgan Keegan & Co. (Morgan Keegan) and to credit Derivium’s account. On August 16, 2001, Morgan Keegan credited Derivium’s account with the IBM stock transferred from petitioner. The following day, August 17, 2001, Derivium sold the 990 shares of IBM stock held in its Morgan Keegan account for $103,984.65 (i.e., $105,035 per share of IBM common stock). The net proceeds from Derivium’s sale of the IBM stock were $103,918.18 (i.e., $103,984.65 minus a $3.47 “S.E.C. Fee” and a $63 “Commission”). On August 22, 2001, the net proceeds from the sale of the IBM stock settled into Derivium’s Morgan Keegan account. On or about August 17, 2001, Derivium’s operations office sent to petitioner two documents. The first document, entitled “Valuation Confirmation”, indicates that Derivium had received the IBM stock into its Morgan Keegan account valued at $104,692.50 (at a “Price per Share for Valuation” of $105.75). Thus, Derivium projected the amount it would lend to petitioner as $94,223.25. The second document, entitled “Activity Confirmation”, however, indicates that as of August 17, 2001, Derivium had “hedged” the IBM stock for a “hedged value” of $103,984.70.[3] On the basis of the “hedged” value Derivium determined petitioner’s actual “loan” amount as $93,586.23 (i.e., 90 percent of $103,984.70). Thus, the “loan” amount was not determined until after Derivium sold the IBM stock. On August 21, 2001, Derivium sent to petitioner a letter informing him that the proceeds of the loan were sent to him according to the wire transfer instructions he had provided a few days earlier. On that same date, a $93,586.23 wire transfer was received and credited to petitioner’s account at IBM Southeast Employees Federal Credit Union. During the term of the “loan” Derivium provided petitioner with quarterly and yearend account statements. The quarterly account statements reported “end-of-quarter collateral value” and dividends such that it appeared that Derivium still held the IBM stock (i.e., Derivium appears to have reported the value of the collateral on the basis of the fair market value of the IBM stock at the end of each calendar quarter rather than the $103,984.65 of sale proceeds, and further reported dividends on the IBM stock, which it credited against the interest accrued during the quarter, as if it continued to hold all 990 shares of IBM stock). Petitioner neither received a Form 1099-div, Dividends and Distributions, nor included any IBM dividend income from the alleged dividends paid on the IBM stock on petitioners’ 2001, 2002, 2003, or 2004 Federal income tax return. In a letter dated July 8, 2004, Derivium informed petitioner that the loan “will mature on August 21, 2004” and that the “total principal and interest that will be due, and payable on the Maturity Date is $124,429.09”. The letter also informed petitioner that, as of July 8, 2004, the value of 990 shares of IBM stock was $83,318.40. Derivium also reiterated to petitioner that, pursuant to the terms and conditions of the master agreement, he was entitled to elect one of the following three options at maturity: (1) “Pay the Maturity Amount and Recover Your Collateral”; (2) “Renew or Refinance the Transaction for an Additional Term”; or (3) “Surrender Your Collateral”. On July 27, 2004, petitioner responded to Derivium’s July 8, 2004, letter, stating that “I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation”; i.e., petitioner relinquished the right to acquire the IBM stock valued at $83,326.32[4] and never made any payments of principal or interest on the $124,250.89 balance due on the “loan”. On September 8, 2004, Derivium sent to petitioner a letter notifying him that the loan matured on August 21, 2004, and that the balance due was $40,924.57 more than the value of the IBM stock on the maturity date. The parties stipulate that the price per share of IBM stock was $105.03 on August 17, 2001, and approximately $84.16 on July 8, 2004. On February 11, 2004, petitioners filed their 2001 joint Federal income tax return. Petitioners did not report the $93,586.23 received from Derivium in exchange for the IBM stock on their 2001 Federal income tax return, nor did they report the termination of the transaction with Derivium on their 2004 Federal income tax return. Petitioner’s cost basis in the 990 shares of IBM stock was $21,171.[5] OPINION The primary issue is whether the transaction, in which petitioner transferred his IBM stock to Derivium and received $93,586.23, was a sale or a loan. Surprisingly, this case presents an issue of first impression in this Court.[6] Nevertheless, there are many cases that provide us with guiding principles. The master agreement between petitioner and Derivium refers to the transaction as a loan; however, “Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked.” United States v. Heller, 866 F.2d 1336, 1341 (11th Cir. 1989); see also Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945) (“The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.”); Gregory v. Helvering, 293 U.S. 465, 470 (1935) (finding the economic substance of a transaction to be controlling and stating: “To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.”). Whether the Transaction Was a Sale of IBM Stock “The term ‘sale’ is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money.” Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981) (citing Commissioner v. Brown, 380 U.S. 563, 570-571 (1965)). Since the economic substance of a transaction, rather than its form, controls for tax purposes, the key to deciding whether the transaction was a sale or other disposition is to determine whether the benefits and burdens of ownership of the IBM stock passed from petitioner to Derivium. Whether the benefits and burdens of ownership have passed from one taxpayer to another is a question of fact that is determined from the intention of the parties as established by the written agreements read in the light of the attending facts and circumstances. See Arevalo v. Commissioner, 124 T.C. 244, 251-252 (2005), affd. 469 F.3d 436 (5th Cir. 2006). Factors the courts have considered in making this determination include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest in the property is acquired; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. See id. at 252; see also Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237—1238. Applying the above factors leads us to the conclusion that petitioner sold his IBM stock to Derivium in 2001. (1) Whether Legal Title Passed On August 16, 2001, petitioner transferred the IBM stock to Derivium’s Morgan Keegan account. The master agreement provides that once Derivium received the IBM stock, Derivium was authorized to sell it without notice to petitioner. Derivium immediately sold the stock. Thus, legal title to the stock passed to Derivium in 2001 when petitioner transferred the IBM stock pursuant to the terms of the master agreement.[7] (2) The Parties’ Treatment of the Transaction In the master agreement the parties characterize the transaction as a loan and characterize the IBM shares as collateral. However, on August 17, 2001, the day after it received the IBM stock, Derivium sold it. Derivium did not determine the value of the so-called loan to petitioner until after it had determined the proceeds it would receive from the sale of the IBM stock. Although petitioner testified that he did not know Derivium had sold the IBM stock and that he believed Derivium was only acting as a custodian of the stock, petitioner admitted that when he signed the agreement he knew that he had authorized Derivium to sell the stock.[8] Petitioners did not report dividends paid on the IBM stock on their 2001, 2002, 2003, or 2004 Federal income tax return, and petitioner was never required to repay any of the principal or interest on the “loan”. Indeed, even though petitioners argue that the “sale” of their IBM stock occurred in 2004, they failed to report the “sale” of their IBM shares on their 2004 Federal income tax return. They also failed to alternatively report any relief of indebtedness income from the transaction on their 2004 return. In short, petitioners did not treat this transaction in a manner consistent with their own characterization of the transaction. (3) Equity Inherent in the Stock Derivium acquired all property interests in the IBM stock, and the next day all of Derivium’s interest in the stock was sold. Petitioner retained no property interest in the stock. At best he had an option to purchase an equivalent number of IBM shares after 3 years at a price equivalent to $93,586.23 plus “interest”. The effectiveness of the option depended on Derivium’s ability to acquire and deliver the required number of IBM shares in 2004. (4) Obligation To Deliver and Pay The master agreement obligates petitioner to transfer the IBM stock to Derivium and Derivium to pay 90 percent of the fair market value of the stock. The amount Derivium had to pay was determined after Derivium sold the IBM stock. (5) Whether the Right of Possession Passed Derivium obtained title to, possession of, and complete control of the IBM stock from petitioner. Derivium immediately exercised those rights and sold the stock. (6) Payment of Property Taxes This factor is inapplicable under the facts of this case. (7) The Risk of Loss or Damage Upon receipt of the $93,586.23 from Derivium in 2001, petitioner bore no risk of loss in the event that the value of the IBM stock decreased. Petitioner was entitled to retain all the funds transferred to him regardless of the performance of the IBM stock in the financial marketplace. (8) Profits From the Property The master agreement provides: [Petitioner] gives * * * [Derivium] the right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, and/or sell outright some or all of the securities during the period covered by the loan. * * * [Petitioner] understands that * * * [Derivium] has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the term of a loan. * * * At best the master agreement gave petitioner an option to repurchase IBM stock from Derivium at the end of the 3 years;[9] however, this option depended on Derivium’s ability to acquire IBM stock in 2004. The foregoing factors indicate that the transaction was a sale of IBM stock in 2001. In the context of taxation, courts have defined a loan as “‘an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree.’” Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000) (quoting Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962)), affg. T.C. Memo. 1998-121; see also Talmage v. Commissioner, T.C. Memo. 2008-34. For a transaction to be a bona fide loan the parties must have actually intended to establish a debtor-creditor relationship at the time the funds were advanced. Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970). “Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts in the case.” Id. at 909. “For disbursements to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment.” Haag v. Commissioner, 88 T.C. 604, 615-616 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). Courts have considered various factors in determining whether a transfer constitutes genuine indebtedness. No one factor is necessarily determinative, and the factors considered do not constitute an exclusive list. See Ellinger v. United States, 470 F.3d 1325, 1333-1334 (11th Cir. 2006) (listing a nonexclusive list of 13 factors); Welch v. Commissioner, supra at 1230.[10] Often it comes down to a question of substance over form requiring courts to “‘look beyond the parties’ terminology to the substance and economic realities’”. BB&T Corp. v. United States, 523 F.3d 461, 476 (4th Cir. 2008) (quoting Halle v. Commissioner, 83 F.3d 649, 655 (4th Cir. 1996), revg. Kingstowne L.P. v. Commissioner, T.C. Memo. 1994-630). Our analysis of the factors relevant to this case leads to the conclusion that even though the documents prepared by Derivium use the term “loan”, the transaction lacked the characteristics of a true loan. The transaction was structured so that petitioner could receive 90 percent of the value of his IBM stock. Petitioner would have no personal liability to pay principal or interest to Derivium, and it would have made no sense to do so unless the value of the stock had substantially appreciated. Petitioner transferred ownership of the stock to Derivium, which received all rights and privileges of ownership and was free to sell the stock. Derivium did immediately sell the stock and immediately passed 90 percent of the proceeds to petitioner. The only right petitioner retained regarding shares of IBM stock was an option, exercisable 3 years later, in 2004, to require Derivium to acquire 990 shares of IBM stock and deliver them to him in 2004. Petitioner’s right to exercise this option in 2004 was wholly contractual because he had already transferred all of the incidents of ownership to Derivium, which had immediately sold the 990 shares.[11] See Provost v. United States, 269 U.S. 443 (1926). Petitioner engaged in the transaction because he thought that the “loan” characterization would allow him to realize 90 percent of the value of the stock, whereas a “sale” would have netted only 80 percent of the stock’s value after payment of tax on the gain. After the transfer petitioners did not conduct themselves as if the transaction was a loan. Petitioners did not report dividends earned on the 990 shares of IBM stock on their Federal income tax returns. When petitioners decided not to “repay the loan” in 2004, they did not report a sale of the stock on their 2004 Federal income tax return and failed to report any discharge of indebtedness income. This failure was totally inconsistent with petitioners’ “loan” characterization. As to Derivium, immediately upon its receipt of petitioner’s stock, it sold the stock in order to fund the “loan”. It did not hold the stock as collateral for a loan. In an ordinary lending transaction the risk of loss to a lender is that the borrower might not repay the loan. In contrast to the ordinary risk assumed by a lender, Derivium’s only risk of loss would have arisen if petitioner had actually repaid the “loan”. Petitioner would very likely have exercised his option to “repay the loan” if the value of the 990 shares of IBM stock, in August 2004, had exceeded the balance due. However, if petitioner had exercised his option under those circumstances, Derivium would have been required to acquire 990 shares of IBM stock at a cost exceeding the amount it would have received from petitioner. On the basis of all of these factors we must conclude that Derivium did not expect or want the “loan” to be repaid. Of course if the value of the IBM stock had been less than the “loan” balance in 2004, it would have been foolish for petitioner to pay the “loan” balance. As petitioner explained at trial, he did not exercise his right to “buy back my shares” because it would have cost more than the shares were worth. We hold that the transaction was not a loan and that petitioner sold his IBM stock for $93,586.23 in 2001.[12] This case presents an issue of first impression in this Court. However, two other Federal courts have recently considered whether the transfer of securities to Derivium under its 90-percent-stock-loan program was a sale for Federal tax purposes. In each of those cases the court, using essentially the same facts and applying the same legal standards that are found in cases such as Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237—1238, and Welch v. Commissioner, 204 F.3d at 1230, found that the 90-percent-stock-loan-program transactions were sales of securities and not bona fide loans. See Nagy v. United States, 104 AFTR 2d 2009-7789, 2010-1 USTC par. 50,177 (D.S.C. 2009) (in an action involving section 6700 promoter penalties, Chief Judge Norton for the U.S. District Court for the District of South Carolina granted the Government’s motion for partial summary judgment, holding that the 90-percent-stock-loan-pro-gram transactions offered by Derivium were sales of securities, not bona fide loans); United States v. Cathcart, 104 aftr 2d 2009-6625, 2009-2 USTC par. 50,658 (N.D. Cal. 2009) (in an action to enjoin defendants from continuing to promote Derivium’s 90-percent-stock-loan program, Judge Hamilton of the U.S. District Court for the Northern District of California granted the Government’s motion for partial summary judgment, holding that the 90-percent-stock-loan-program transactions offered by Derivium were sales of securities, not bona fide loans). Subsequently, the District Court for the Northern District of California permanently enjoined Charles Cathcart from, directly or indirectly, by use of any means or instrumentalities: 1. Organizing, promoting, marketing, selling, or implementing the “90% Loan” program that is the subject of the complaint herein; 2. Organizing, promoting, marketing, selling, or implementing any program, plan or arrangement similar to the 90% Loan program that purports to enable customers to receive valuable consideration in exchange for stocks and other securities that are transferred or pledged by those customers, without the need to pay tax on any gains because the transaction is characterized as a loan rather than a sale; [United States v. Cathcart, No. 4:07-CV-04762-PJH (N.D. Cal. Nov. 23, 2009).] We note that Mr. Cathcart stipulated to the entry of this permanent injunction. With respect to Derivium, a magistrate judge for the District Court for the Northern District of California recommended that “injunctive relief against Derivium is ‘necessary or appropriate for the enforcement of the Internal Revenue laws.’” United States v. Cathcart, 105 AFTR 2d 2010-1287, at 2010-1292 (N.D. Cal. 2010). District Court Judge Hamilton adopted the magistrate judge’s recommendations, finding that the report was well reasoned and thorough in every respect. United States v. Cathcart, 105 AFTR 2d 2010-1293 (N.D. Cal. 2010).[13] Securities Lending Arrangement On brief petitioners argue that the transaction was a nontaxable securities lending arrangement analogous to the following situation described in Rev. Rui. 57-451, 1957-2 C.B. 295, 296: (2) The stockholder deposits his stock with his broker in a “safekeeping” account and, at the time of deposit, endorses the stock certificates and then authorizes the broker to “lend” such certificates in the ordinary course of the broker’s business to other customers of the broker. The broker has the certificates cancelled and new ones reissued in his own name. In Rev. Rul. 57-451, supra, the Internal Revenue Service was asked to determine whether the situation described above was a taxable disposition of stock by the stockholder. Petitioners urge this comparison because the revenue ruling concludes that there is no taxable disposition of stock unless and until the broker satisfies his obligation to the stockholder by delivering property that does not meet the requirements of section 1036. Section 1036 provides for nonrecognition if common stock in a corporation is exchanged solely for common stock in the same corporation. Id., 1957-2 C.B. at 298. By analogy, petitioner seems to argue that his IBM stock was not disposed of until 2004 when he surrendered his right to reacquire the IBM stock in satisfaction of his “debt” to Derivium. The transaction differs significantly from that described in the revenue ruling. Derivium was not acting as a broker, and the arrangement between petitioner and Derivium was not the type of securities lending arrangement described in the revenue ruling. In the revenue ruling, the stockholder authorized his broker, subject at all times to the instructions of the stockholder, to “lend” his stock to others to satisfy obligations in a short sale transaction. The “loan” in the revenue ruling required the borrower, “on demand,” to restore the lender to the same economic position that he had occupied before entering into the “loan”. Rev. Rui. 57-451, 1957-2 C.B. at 297, described the transaction as follows: In such a case, all of the incidents of ownership in the stock and not mere legal title, pass to the “borrowing” customer from the “lending” broker. For such incidents of ownership, the “lending” broker has substituted the personal obligation, wholly contractual, of the “borrowing” customer to restore him, on demand, to the economic position in which he would have been as owner of the stock, had the “loan” transaction not been entered into. See Provost v. United States, 269 U.S. 443 * * * (1926). * * * The securities lending arrangement described in Provost was also terminable on demand by either the lender or the borrower so that the lender retained all the benefits and assumed all of the burdens incident to ownership of the stock.[14] The master agreement did not enable petitioner to retain all of the benefits and burdens of being the owner of the IBM stock. Neither petitioner nor Derivium could terminate the “loan” on demand. Petitioner could not repay the “loan” and demand return of his stock during the 3-year term of the “loan”. As a result, petitioner did not retain the benefits and burdens of ownership. He did not retain the benefit of being able to sell his interest in the stock at any time during the 3-year period and, therefore, could not take advantage of any increases in the stock’s value at any given time during the 3-year period. At the same time petitioner bore no risk of loss in the event that the stock’s value decreased. In 1978 Congress codified and clarified the then-existing law represented by Rev. Rul. 57-451, supra, by enacting section 1058. Section 1058(a) provides for nonrecognition of gain or loss when securities are transferred under certain agreements as follows: In the case of a taxpayer who transfers securities * * * pursuant to an agreement which meets the requirements of subsection (b), no gain or loss shall be recognized on the exchange of such securities by the taxpayer for an obligation under such agreement, or on the exchange of rights under such agreement by that taxpayer for securities identical to the securities transferred by that taxpayer. Section 1058(b) requires the securities agreement to meet the following four requirements in order to qualify for nonrecognition: SEC. 1058(b). Agreement Requirements. — In order to meet the requirements of this subsection, an agreement shall— (1) provide for the return to the transferor of securities identical to the securities transferred; (2) require that payments shall be made to the transferor of amounts equivalent to all interest, dividends, and other distributions which the owner of the securities is entitled to receive during the period beginning with the transfer of the securities by the transferor and ending with the transfer of identical securities back to the transferor; (3) not reduce the risk of loss or opportunity for gain of the transferor of the securities in the securities transferred; and (4) meet such other requirements as the Secretary may by regulation prescribe. The master agreement does not satisfy the requirements of section 1058(b)(3). In order to meet the requirements of section 1058(b)(3), the agreement must give the person who transfers stock “all of the benefits and burdens of ownership of the transferred securities” and the right to “be able to terminate the loan agreement upon demand.” Samueli v. Commissioner, 132 T.C. 37, 51 (2009). In Samueli we focused on the meaning of the requirement in section 1058(b)(3). [W]e read the relevant requirement * * * to measure a taxpayer’s opportunity for gain as of each day during the loan period. A taxpayer has such an opportunity for gain as to a security only if the taxpayer is able to effect a sale of the security in the ordinary course of the relevant market (e.g., by calling a broker to place a sale) whenever the security is in-the-money. A significant impediment to the taxpayer’s ability to effect such a sale * * * is a reduction in a taxpayer’s opportunity for gain. [Id. at 48.] Petitioner was bereft of any opportunity for gain during the 3-year period because he could reacquire the IBM stock only at maturity. Schedule D of the master agreement not only provides that Derivium had the “right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, and/or sell outright some or all of the securities during the period covered by the loan”, but also provides that Derivium “has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the term of a loan.” Because petitioner was prohibited from demanding a return of any stock during the 3-year period, his opportunity for gain was severely diminished. See Samueli v. Commissioner, supra at 48. Accordingly, we hold that the transaction is not analogous to the second situation in Rev. Rul. 57-451, supra, and is not an arrangement that meets the requirements of section 1058. Addition to Tax Under Section 6651(a)(1) Section 6651(a)(1) provides for an addition to tax where a failure to timely file a Federal tax return is not due to reasonable cause or is due to willful neglect. Pursuant to section 7491(c), the Commissioner generally bears the burden of production for any penalty, but the taxpayer bears the ultimate burden of proof. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Petitioners filed their 2001 Federal income tax return on February 11, 2004, more than 21 months after its due date. Therefore, respondent has met his burden of production under section 7491(c); and in order to avoid the section 6651(a)(1) addition to tax, petitioners have the burden of establishing reasonable cause and the absence of willful neglect for failure to timely file. See Natkunanathan v. Commissioner, T.C. Memo. 2010-15. A delay in filing a Federal tax return is due to reasonable cause “If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time”. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. The Supreme Court has said that willful neglect, in this context, means “a conscious, intentional failure or reckless indifference.” United States v. Boyle, 469 U.S. 241, 245 (1985). The only explanation petitioners offered for the delay in filing their 2001 Federal income tax return was that they reported on their 2001 Federal income tax return that they “paid $25,150 in taxes,” and that “without recharacter-izing the loan as a sale * * * [they] would have been entitled to a refund of $3,979.” Petitioners’ explanation establishes neither reasonable cause nor the absence of willful neglect. Accordingly, we sustain respondent’s determination and hold petitioners liable for the addition to tax pursuant to section 6651(a)(1). Accuracy-Related Penalty Under Section 6662(a) Section 6662(a) and (b)(1) and (2) provides that a taxpayer is liable for a 20-percent accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return attributable to, inter alia, (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. See New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. 161, 189-191 (2009). The Commissioner generally bears the burden of production for any penalty, but the taxpayer bears the ultimate burden of proof. Sec. 7491(c); Higbee v. Commissioner, supra at 446. A substantial understatement of income tax is defined as the greater of “10 percent of the tax required to be shown on the return for the taxable year,” or “$5,000.” Sec. 6662(d)(1)(A). Negligence is defined as “any failure to make a reasonable attempt to comply with the provisions of this title”, and disregard includes “any careless, reckless, or intentional disregard.” Sec. 6662(c). Respondent has met his burden of production by establishing that petitioner sold his IBM stock in 2001 and failed to report the capital gain. Petitioners’ failure to report the gain from the sale of the IBM stock in 2001 results in a substantial understatement of income tax because the resultant understatement exceeds $5,000 and is more than 10 percent of the correct tax. The penalty under section 6662(a) shall not be imposed upon any portion of an underpayment where the taxpayer shows that he acted with reasonable cause and in good faith with respect to such portion. See sec. 6664(c)(1); Higbee v. Commissioner, supra at 448. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Higbee v. Commissioner, supra at 448; sec. 1.6664-4(b)(1), Income Tax Regs. As previously noted, petitioners did not report their annual dividends from their IBM stock which were, under their version of the transaction, credited yearly against their interest due to Derivium. A payment of the dividends by IBM, under their version of the transaction, would have created taxable income to them. Further, in 2004 they did not report the sale of their IBM stock or any gain from that transaction, nor did they report any relief of indebtedness income. These failures were inconsistent with petitioners’ version of the transaction. “Under some circumstances, a taxpayer may avoid liability for the accuracy-related penalty by showing reasonable reliance on a competent professional adviser.” Tigers Eye Trading, L.L.C. v. Commissioner, T.C. Memo. 2009-121 (citing United States v. Boyle, supra at 250-251, and Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991)). For reliance on professional advice to excuse a taxpayer from the accuracy-related penalty, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Freytag v. Commissioner, supra at 888; Tigers Eye Trading, L.L.C. v. Commissioner, supra. “The validity of the reliance turns on ‘the quality and objectivity of professional advice which they obtained’.” Tigers Eye Trading, L.L.C. v. Commissioner, supra (quoting Swayze v. United States, 785 F.2d 715, 719 (9th Cir. 1986)). To be reasonable, professional tax advice must generally be from a competent and independent adviser unburdened with a conflict of interest and not from promoters of the investment. Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004-279. “Courts have routinely held that taxpayers could not reasonably rely on the advice of promoters or other advisers with an inherent conflict of interest such as one who financially benefits from the transaction.” Tigers Eye Trading, L.L.C. v. Commissioner, supra (citing Hansen v. Commissioner, 471 F.3d 1021, 1031 (9th Cir. 2006) (“a taxpayer cannot negate the negligence penalty through reliance on a transaction’s promoters or on other advisors who have a conflict of interest”), affg. T.C. Memo. 2004-269, Van Scoten v. Commissioner, 439 F.3d 1243, 1253 (10th Cir. 2006) (“To be reasonable, the professional adviser cannot be directly affiliated with the promoter; instead, he must be more independent”), affg. T.C. Memo. 2004 — 275, Barlow v. Commissioner, 301 F.3d 714, 723 (6th Cir. 2002) (noting “that courts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its validity”), affg. T.C. Memo. 2000-339, Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) (taxpayer could not reasonably rely on professional advice of someone known to be burdened with an inherent conflict of interest — a sales representative of the transaction), affg. T.C. Memo. 1993-480, Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993) (reliance on promoters or their agents is unreasonable because such persons are not independent of the investment), affg. Donahue v. Commissioner, T.C. Memo. 1991-181, and Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir. 1992) (finding negligence where taxpayer relied on person with financial interest in the venture), affg. T.C. Memo. 1991-449). “A promoter’s self-interest makes such ‘advice’ inherently unreliable.” Id. At trial petitioner testified that he relied on the advice of his financial adviser, Mr. Falls, in deciding to enter into the transaction. However, petitioners have not made any effort to establish Mr. Falls’ credentials or qualifications as a financial or tax adviser, nor have they established what relationship Mr. Falls had with Derivium, if any. Petitioner also testified that he relied upon his accountant Sharon Cooper as a tax adviser. Ms. Cooper was not called as a witness. Petitioner testified that Ms. Cooper provided him with the memorandum dated December 12, 1998, from Robert J. Nagy to Charles D. Cathcart regarding “Tax Aspects of First Security Capital’s 90% Stock Loan”. Mr. Cathcart was also Derivium’s president.[15] In the 1998 memorandum Mr. Nagy opines that First Security Capital’s 90-percent-stock-loan program was designed to create genuine indebtedness for Federal tax purposes. Petitioner testified that he knew nothing about Mr. Nagy other than that he apparently wrote the 1998 opinion letter addressed to Mr. Cathcart concerning another 90-percent-stock-loan transaction. In the light of the previously cited cases, we find that petitioners have failed to establish reasonable reliance upon a competent professional adviser. Accordingly, we sustain respondent’s determination to impose an accuracy-related penalty under section 6662(a). In reaching our holdings herein, we have considered all arguments made and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit. To reflect the foregoing, Decision will be entered under Rule 155. Reviewed by the Court. Colvin, Cohen, Wells, Gale, Thornton, Marvel, Goeke, Kroupa, Gustafson, and Paris, JJ., agree with this majority opinion. Morrison, J., did not participate in the consideration of this opinion. All section references are to the Internal Revenue Code as amended, and Rule references are to the Tax Court Rules of Practice and Procedure. The use of the terms "loan”, “collateral”, "borrow”, “lend”, “hedge”, and “maturity” with all related terms throughout this Opinion is merely for convenience in describing what petitioners contend the transaction represents. Derivium’s Morgan Keegan account statement reflects a sale price of $103,984.65 for the 990 shares of IBM common stock. The difference between Derivium’s “hedged value” of $103,984.70 and the $103,984.65 reported on Derivium’s Morgan Keegan account statement appears to be due to rounding. The Morgan Keegan statement reports the share price at the time of sale at $105,035, whereas Derivium’s “Activity Confirmation” report indicates the share price at the time the shares were “hedged” at $105.03505. The Sept. 8, 2004, letter indicates that the collateral, the IBM stock, was valued at $83,326.32 “using the average of the closing prices, as reported by the Wall Street Journal, for the ten trading days prior to the maturity date.” In the notice of deficiency respondent’s determination was made using a cost basis of $10,399 for petitioner’s 990 shares of IBM stock. There are now other cases pending in the Tax Court involving Derivium transactions. We understand that from 1998 to 2002 Derivium engaged in approximately 1,700 similar transactions involving approximately $1 billion. Derivium Capital L.L.C. v. United States Trustee, 97 AFTR 2d 2006-2582, at 2006-2583 to 2006-2584 (S.D.N.Y. 2006). The Government estimated the total tax loss associated with Derivium’s scheme to be approximately $235 million. Complaint, United States v. Cathcart, No. 07-4762 (N.D. Cal. filed Sept. 17, 2007). Legal title is one of several factors in our test and may not be determinative in every situation; e.g., brokers holding stock for the accounts of customers or as security for advances under highly regulated conditions. See Provost v. United States, 269 U.S. 443 (1926). Indeed, Congress has provided that certain types of security lending arrangements do not have to be recognized as taxable transactions if they meet the strict requirements of sec. 1058. See infra pp. 42-45. At trial petitioner testified: Q What responsibilities do you believe that Derivium, let’s call it DC, Derivium Capital, had to you? A They had a responsibility of protecting me throughout that three-year period to ensure that the stock was there at the completion of the transaction. Q Would this enable you to the return of your IBM shares? A That would enable me to buy back my shares, yes. ‡ ‡ 3: ‡ * Q Had they sold the shares, what percentage would you have received? A Had they sold? Well, they had the right to sell it. Q Wait, wait, hold on a second. Let’s give him a chance to — are we ready? Okay. A I would not have received anything because they had the right, that was something that I agreed to, but they also had the responsibility as a custodian to return to me the total number of 990 shares at the completion of the transaction. Petitioner testified that he had an option to reacquire 990 shares of IBM stock by paying the balance due in 2004, but he did not exercise that option: A I had three options as indicated in the documentation. The option I chose was to relinquish the shares in 2004. Q So there was no requirement that you had to repay the loan? A There was a choice. I could have extended the loan, I could have relinquished the loan, but the loan was upside down. There was a debt of $40,000. I chose to relinquish the shares. That was in payment for the loan becoming a taxable event in 2004. As previously mentioned, petitioners failed to report a sale of the IBM stock on their 2004 Federal income tax return. For example the nonexclusive list of factors enumerated in Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), are: (1) Whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. In some instances Derivium’s clients have requested the return of stock. The parties stipulated that Derivium’s failure to return the stock has resulted in a number of lawsuits; e.g., The Lee Family Trust v. Derivium Capital L.L.C., U.S. District Court, District of South Carolina, Robert G. Sabelhaus v. Derivium Capital, U.S. District Court, District of South Carolina, The Hammond Family 1994, L.P. v. Diversified Design, U.S. District Court, District of South Carolina, Newton Family L.L.C. v. Derivium Capital, U.S. District Court, District of Wyoming, WCNfGAN Partners, Ltd. v. Charles Cathcart, U.S. District Court, District of Wyoming, Derivium Capital L.L.C. v. General Holdings Inc., U.S. District Court, District of South Carolina, Grayson v. Cathcart, U.S. District Court, District of South Carolina. On Sept. 1, 2005, Derivium filed a ch. 11 bankruptcy petition, and on Nov. 4, 2005, the case was converted to ch. 7 and venue was moved to South Carolina. As noted by the U.S. Court of Appeals for the Fourth Circuit when it rejected the taxpayer’s argument that it had incurred a debt because the arrangement was labeled a “loan”: “In closing, we are reminded of ‘Abe Lincoln’s riddle ... “How many legs does a dog have if you call a tail a leg?””’ Rogers v. United States, 281 F.3d 1108, 1118 (10th Cir. 2002). ‘The answer is “four,” because “calling a tail a leg does not make it one.”’ Id." BB&T Corp. v. United States, 523 F.3d 461, 477 (4th Cir. 2008). The report and recommendation of the magistrate judge, which was adopted by the District Court judge, stated: Section 7408 authorizes a court to enjoin persons who have engaged in any conduct subject to penalty under § 6700 if the court finds that injunctive relief is appropriate to prevent the recurrence of such conduct. * * * * * * * * * * To establish a violation of § 6700 warranting an injunction under § 7408, the government must prove that defendant: (1) organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) knew or had reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct. United States v. Estate Preservation Servs., 202 F.3d 1093, 1098 (9th Cir. 2000) citing I.R.C. §§ 6700(a), 7408(b). “Under § 6700, any ‘plan or arrangement’ having some connection to taxes can serve as a ‘tax shelter’ and will be an ‘abusive’ tax shelter if the defendant makes the requisite false or fraudulent statements concerning the tax benefits of participation.” United States v. Raymond, 228 F.3d 804, 811 (7th Cir. 2000). “Congress designed section 6700 as a ‘penalty provision specifically directed toward promoters of abusive tax shelters and other abusive tax avoidance schemes?” United States v. White, 769 F.2d 511, 515 (8th Cir. 1985) (emphasis in original). * * * In an order dated September 22, 2009, the district court granted in part and denied in part, Defendants’ motions for summary judgment. The court found that the undisputed evidence revealed that[4]: as part of the loan transaction in question, legal title of a customer’s securities transfers to Derivium USA (for example) during the purported loan term in question, which vests possession of the shares in Derivium’s hands for the duration of the purported loan term; that the customer must transfer 100% of all shares of securities to Derivium USA and that once transferred, Derivium USA sells those shares on the open market, and that once sold, Derivium USA transfers 90% of that sale amount to the customer as the “loan” amount, keeping 10% in Derivium USA’s hands; that during the term of the loan, the Master Loan Agreement provides that Derivium USA has the right to receive all benefits that come from disposition of the customer’s securities, and that the customer is not entitled to these benefits; that the customer is furthermore prohibited from repaying the loan amount prior to maturity and is not required to pay any interest before the loan maturity date; and that, at the end of the purported loan term, the customer is not required to repay the amount of the loan (but merely allowed to do so as one option at the loan’s maturity date) and can exercise the option to walk away from the loan entirely at the maturity date without repaying the principle; and thus, can conceivably walk away from the transaction without paying interest at all on the loan. The following factual findings are taken directly from Judge Hamilton’s Order dated September 22, 2009. Docket No. 333. The district court concluded that analysis of these and other undisputed facts pursuant to either the benefits/bur dens approach outlined in Grodt & McKay Realty, Inc. v. Commissioner of Internal Revenue, 77 T.C. 1221, 1236 (Tax Court 1981), or the approach outlined in Welch v. Comm’r, 204 F.3d 1228, 1230 (9th Cir. 2000), compelled the conclusion that the transactions in question constituted sales of securities, rather than bona fide loan transactions. See e.g., Grodt, 77 T.C. at 1236-37 (applying multi-factor test to determine point at which the burdens and benefits of ownership are transferred for purposes of qualifying a transaction as a sale); Welch, 204 F.3d at 1230 (examining factors necessary to determine whether a transaction constitutes a bona fide loan). The district court also found that the “substance over form doctrine” further supported the conclusion that, in looking beyond the actual language of the Master Loan Agreement to the totality of the undisputed facts, the substance of the transaction between the parties constituted a sale, and not a bona fide loan. See, e.g., Harbor Bancorp and Subsidiaries v. Comm’r, 115 F.3d 722, 729 (9th Cir. 1997) (it is axiomatic that tax law follows substance and not form). sj: sj{ :js if: Reviewing the above evidence and legal authorities cited above, the Court concludes that the evidence against Defendant Derivium USA is strong and that the merits of the case support entry of default judgment here. The Court concludes that an injunction against Derivium is necessary or appropriate for the enforcement of the internal revenue laws. See e.g., United States v. Thompson, 395 F.Supp.2d 941, 945-46 (E.D. Cal. 2005) (“Injunctive relief is appropriate if the defendant is reasonably likely to violate the federal tax laws again.”) [United States v. Cathcart, 105 AFTR 2d 2010-1287, at 2010-1290 to 2010-1291 (N.D. Cal. 2010).] In Provost v. United States, 269 U.S. at 452, the Supreme Court described the transaction as follows: During the continuance of the loan the borrowing broker is bound by the loan contract to give the lender all the benefits and the lender is bound to assume all the burdens incident to ownership of the stock which is the subject of the transaction, as though the lender had retained the stock. The borrower must accordingly credit the lender with the amount of any dividends paid upon the stock while the loan continues and the lender must assume or pay to the borrower the amount of any assessments upon the stock. * * * The original short sale is thus completed and there remains only the obligation of the borrowing broker, terminable on demand, either by the borrower or the lender, to return the stock borrowed on repayment to him of his cash deposit, and the obligation of the lender to repay the deposit, with interest as agreed. * * * See supra pp. 39-40 regarding Nagy v. United States, 104 AFTR 2d 2009-7789, 2010-1 USTC par. 50,177 (D.S.C. 2009).