T.C. Memo. 2010-189


UNITED STATES TAX COURT


CECILIA SHAO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent


Docket No. 12697-05.                    Filed August 26, 2010.


John B. Kern, for petitioner.

Daniel J. Parent, for respondent.


MEMORANDUM OPINION


HOLMES, Judge:  Cecilia Shao transferred stock to Derivium Capital in 2001 and received money in return.  The Commissioner calls this a sale.  But Shao calls it a nonrecourse loan secured by her stock, because Derivium promised her that she could get her stock back if she repaid the loan after three years.  Derivium, however, was not what it appeared.  Instead of hedging

the upside risk that it was taking on--which is what Derivium said it was doing--Derivium simply sold Shao's stock almost as soon as it could.  The firm eventually went bankrupt and is widely reported to have been a Ponzi scheme.  In Calloway v. Commissioner, 135 T.C. ___ (2010), we held that one of Derivium's customers sold his stock when he transferred it to Derivium's control.

In this case, we consider whether Shao, unlike Calloway, can avoid the penalty that the Commissioner has asserted against her.

## Background

### I. Shao

The facts in this case are largely uncontested.  Cecilia Shao moved to California from Taiwan as a child and did well in school, earning a degree in cultural anthropology from the University of California, Santa Barbara in 1993.  After college, she put her degree to work in a museum, but quickly began looking for better (or at least better paying) jobs--first at a finance company, and in 1996 as an administrative assistant for Veritas Software Corporation.  This was the start of the dot-com boom, and Veritas offered each new employee an initial stock grant and then more stock after each merit review.  Shao didn't have any experience with stocks, and so she did what was "like a default" for Veritas employees--she opened an account with E*trade because it administered Veritas's merit grants and employee stock option

program.  Now that she was working in the high-tech industry and had stock options, Shao decided she needed to hire someone to prepare her tax returns, so she turned to a firm named Wade Financial.

Shao rose at Veritas, ultimately becoming a contracts administrator in the legal department.  Over the next few years, she accumulated more than 6,000 shares of Veritas stock in her E*trade account and saw it as a source of income for retirement-- her nest egg.  But at some point she needed money to buy a car and began looking for ways to unlock her stock's value without selling.  Shao turned to a certified financial planner named Jovita Honor for advice.  Honor worked at Wade Financial and also prepared Shao's taxes.  Honor suggested using a margin loan, so Shao signed up for one with E*trade.

Margin-loan brokers offer stockholders a loan worth some of their stocks' value, but usually require that the remaining value not fall below a certain limit, or margin.  If the stock value falls too low to cover the margin, the stockholder has to deliver more collateral or pay back part of the loan to keep the broker secured.  This makes a margin loan risky.

Shao's stock increased in value from less than $60,000 to upwards of $360,000 by July 2001.  But Shao was still riding the dot-com bubble when it began to leak--Veritas stock began to sink in early 2001.  Shao, like many who didn't know the bubble was a

bubble, mistook the decline for a temporary correction, and didn't want to sell her nest egg. But at this point Shao also wanted to buy a home and needed cash for a downpayment, so she asked Honor about options with lower risk.

Honor thought she had found something better for her clients like Shao--she discovered a South Carolina company called Derivium Capital, LLC. Derivium offered what it called loans worth 90 percent of a stock's value, with interest usually set at 9.5 or 10.5 percent, and a term of two to five years. The loans were nonrecourse, meaning that if a borrower didn't repay, Derivium would not have to return the stock or its equivalent to the borrower, but couldn't sue for any unpaid balance. And unlike E*trade's loans, the Derivium loans had no margin requirements. Derivium boasted to its potential clients that it could make these loans because it had a sophisticated hedging strategy.

Honor recommended a Derivium loan to meet Shao's objectives, and Shao agreed. The loan was for three years at 10.5 percent interest. It was nonrecourse, and at the end of the term, left her with three choices. She could retrieve her stock by repaying the loan plus interest, surrender the stock, or put off a final decision by renewing the loan. But renewing the loan wasn't cheap--she would have to pay a fee of 4.5 percent of the original

value of her stock if its price had fallen.[1]  During the period covered by the loan, Derivium reserved the right to "assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities," without notice to Shao.  Shao waived her rights to receive many of the benefits of the stock during the term of the loan, and she could not prepay.  She did keep the right to receive any dividends, which Derivium promised to credit against the interest she owed--but since her stock didn't pay dividends, she never paid interest under this provision.  At the end of the loan term Shao could repay the loan and get back "the same number of shares of the same securities received as collateral," which would "reflect any and all stock splits, conversions, exchanges, mergers, or other distributions, except dividends credited toward interest due."  Shao believed that the only difference between Derivium's deal and her E*trade margin account was that she wasn't subject to margin calls with Derivium.

Shao and Derivium's president, Charles Cathcart, signed the Master Agreement on June 27, 2001.  That same day, Shao asked E*trade to transfer her Veritas shares and the associated margin

---

[1] The renewal fee in <u>Calloway v. Commissioner</u>, 135 T.C. ___ (2010), was a percentage of the balance due at maturity, but Shao's documents show that the renewal fee Derivium charged her was a percentage of the collateral value at the beginning of the loan term.  This appears to be the only difference between the structure of these two Derivium deals and it doesn't affect our analysis.

debt to Derivium's account at First Union Securities.  On July 5, Derivium confirmed the amount of the E*trade margin debt it would accept when the shares were transferred.  Derivium got Shao's shares on July 6.  On July 9, Derivium sold the Veritas stock-- without Shao's knowledge--in several sales ranging between $57.20 and $57.99 a share.  That same day, Derivium sent Shao a "Valuation Confirmation," letting her know that the precise "hedged value" of her stock was $361,980.60, and that after accounting for the existing debt from her E*trade margin loan, she would receive $138,081.43 cash via wire transfer.  Shao got the loan proceeds on July 11.  Derivium got the money from the Veritas stock sale on July 12.

Consistent with Shao's understanding of the transaction, Honor prepared Shao's 2001 tax return without reporting a sale of the Veritas stock.  Shao never received a Form 1099-B, Proceeds from Broker and Barter Exchange Transactions, for the sale of the securities, nor a Form 1099-C, Cancellation of Debt, and didn't withhold any information from Honor.

During the loan's term, Derivium sent Shao quarterly account statements reflecting the interest accrued, the balance of the loan, and the value of the shares.  In June 2003, these quarterly statements began coming from Bancroft Loan Processing, not Derivium.  The change was apparent only in the very fine print at the bottom of the statements--Bancroft's statements otherwise

looked identical to Derivium's.  The 2003 year-end statement and all Shao's later statements came from "Bancroft U.S. Processing." And when the three-year term was up, it was "Bancroft Ventures Limited" that wrote Shao to remind her that she could renew the loan.  None of the statements from the various Bancroft entities during the term of the first loan showed a business location other than the United States; they even listed a South Carolina phone number.

Despite the halving of her stock's value over the three-year term of the loan, Shao nonetheless paid the renewal fee of more than $16,000 to Bancroft Ventures in July 2004 to keep the loan alive.  But time and interest made this deal look doubtful to someone without Shao's optimism.  If she had repaid the loan instead of renewing it, she would have needed to send Bancroft over $400,000 for stock worth only about $165,000.  Shao, though, still had hope and credibly testified that she renewed the loan thinking the market would rebound and she could redeem her stock at the end of a second three-year term.

The new Master Loan Financing and Security Agreement which Shao signed came from Bancroft Ventures, Ltd., and prominently mentioned that BVL was a company based on the Isle of Man.  The provisions of this agreement were different from those of the first one.  For instance, Article 12 prohibited Shao from granting any security interest in the collateral (which,

remember, had already been sold) superior to Bancroft's interest and required Bancroft to give Shao notice if it did certain things with her stock. The Loan Schedule, however, preserved Derivium's original rights to "assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, sell, sell outright and/or otherwise dispose of some or all of the Collateral." The Loan Agreement Rider made it explicit that "Borrower is the lawful owner of the Collateral." It also promised Shao that "All Collateral pledged for all Previous Loans made to Borrower under Derivium Documents has been in the custody of Derivium, as agent for BVL, or in the custody of BVL, and is in the custody of BVL as at the date hereof * * * ."

About a week after renewing her loan, Shao was laid off from Veritas. She got a letter from the California Franchise Tax Board in July 2004 telling her the state was challenging her tax treatment of the 2001 loan proceeds.[2] In early 2005, she learned of problems other Derivium clients were having, and Bancroft sent her a letter about some issues it was experiencing. By this point, Honor had "dumped" Shao as a client, and Shao turned to a

---

[2] The parties did not enter this letter into the record, so we make no finding of fact regarding its contents beyond Shao's admissions at trial. However, we believe her testimony that the letter was sent July 13, 2004. Shao renewed her loan by writing a check to Bancroft Ventures dated June 30, 2004, and a 2004 letter from Bancroft dates Shao's new loan to July 11, 2004. We therefore find as a matter of fact that Shao received the Franchise Tax Board letter after she renewed her loan.

man named Mr. Nagy for additional tax advice.[3]  Finally, in April 2005, the Commissioner sent Shao a notice of deficiency, asserting that she had sold her Veritas stock in 2001.  Shao contested the notice of deficiency with a timely petition.  She was a Californian when she filed the petition, and we tried the case in San Francisco.

II. Derivium

To understand the Commissioner's position, however, requires some understanding of Derivium's history.[4]  Charles Cathcart started Derivium Capital in 1998 under the name "First Security Capital."  In re Derivium Capital, LLC, 380 Bankr. 392, 395 (Bankr. D.S.C. 2007).  Cathcart, formerly employed as the chief economist for the eastern division of Citibank, owned the company with his son Scott and one Yuri Debevc.  Id.  Together, they marketed 90-percent loans during the peak of the dot-com bubble, often targeting individuals with low-basis stock that had

---

[3] Although Shao didn't specify Mr. Nagy's first name, one Robert Nagy was a defendant in an action to enjoin the promotion of tax-fraud schemes allegedly carried out by Derivium and related entities.  United States v. Cathcart, No. C 07-4762 (N.D. Cal., Sept. 12, 2008) (order denying defendant Nagy's second request for a stay, severance, and venue transfer); United States v. Cathcart, No. C 07-4762 (N.D. Cal., June 27, 2008) (order denying defendant Nagy's first motion to sever and transfer venue).

[4] This section is provided for background only--we make no findings of fact as to Derivium's history outside the (already presented) facts specific to Shao's case, although this section summarizes other published decisions.

appreciated significantly, but who didn't have the means to engage in more sophisticated financial transactions on their own. The Derivium founders told borrowers that they used a proprietary hedging strategy to reduce the risk associated with making the 90-percent loans.[5]  Cathcart once referred to Derivium's secret hedging strategy as "our own Coca-Cola syrup."  Southall, "Loyal to the company? Here's how to hedge," Investment News, Aug. 6, 2001.  At the time, commentators trumpeted the company as offering "little guy" investors opportunities that before had only been used by the ultrarich.  See, e.g., Gross, "How to Salvage a Portfolio," N.Y. Times Mag., Apr. 8, 2001, at 75.

For a while, the system seemed to work.  Derivium made approximately 1,700 loans totaling about $1 billion with commissions of $22 million.  Derivium Capital LLC v. United States Trustee, 97 AFTR 2d 2006-2582 (S.D.N.Y. 2006).  As loan terms expired, some borrowers even repaid their loans and got their collateral back.  Although Derivium sold most of the stock immediately to pay off other investors, it did make some small real estate investments and even used profits from them to cover the cost of returning stock to some of the borrowers.  Id.  But

---

[5] Derivium's asserted hedging activity apparently masked the fact that their long-term strategy, reminiscent of South Park's Underpants Gnomes, relied on a business plan of "Step 1: Make 90% loans. Step 2: ? Step 3: Profit."  See Comaford-Lynch, "Make Your Financing Pitch Sizzle," Business Week Online (Feb. 20, 2007), http://www.businessweek.com/smallbiz/content/feb2007/ sb20070219_940216.htm.

as the dot-com bubble burst, there were fewer people holding appreciated stock, and Derivium ran out of new clients and new money.

In 2001, before Derivium ran out of money altogether, the California Corporations Commissioner sued to enjoin the firm from marketing the 90-percent loan, alleging that either Derivium was an unlicensed broker dealing in securities or that Derivium was an unlicensed lender making consumer or commercial loans. The court granted summary judgment partially in Derivium's favor, finding that Derivium had engaged in marketing *bona fide* loans, not sales of stock. People v. Derivium Capital, LLC, No. 02AS05849 (Cal. Super. Ct. Nov. 5, 2003); see also Derivium Capital LLC v. United States Trustee, 97 AFTR 2d 2006-2582 (S.D. N.Y. 2006). The California Superior Court in Sacramento County entered a $750,000 judgment against Derivium after Derivium agreed that it broke California law requiring lenders and stock brokers be licensed. People v. Derivium Capital, LLC, No. 02AS05849 (Cal. Super. Ct. June 13, 2006). The court also enjoined Derivium's owners from "marketing, brokering, or making of stock loans in the State of California" until they had a license. Id. (Oct. 12, 2006). Bancroft had a harder time; it did not appear for trial, and the court found that Bancroft had engaged in both unlicensed lending and unlicensed stock brokerage. Id. (Oct. 16, 2006) ("The Court expressly finds that

based on the evidence presented at trial, that the stock loans transactions entered into by Bancroft Ventures Limited amounted to the constructive purchase and sale of the securities pledged as collateral * * * for the purpose of California Corporations Code Section 25210."). This litigation forced Derivium to stop doing business in 2001, but Bancroft agreed to continue running the business in 2002. Derivium Capital LLC v. United States Trustee, 97 AFTR 2d 2006-2582 (S.D. N.Y. 2006).[6]

But in 2003 the lawsuits began. Investors wanting their stock back found out that Derivium didn't have it and couldn't afford replacement shares. They filed suits in South Carolina, California, Wyoming, Connecticut, Delaware, and New York.[7]

Not to be outdone, in 2004 the IRS began to investigate whether Derivium and its related entities had promoted an abusive

---

[6] Shao got statements from Derivium until 2003, suggesting that Derivium did not entirely stop doing business despite running out of money.

[7] A few examples of opinions issued in the nearly 70 civil cases brought as a result of the Derivium scheme--Sabelhaus v. Derivium Capital, 150 Fed. Appx. 226 (4th Cir. 2005) (confirming arbitration award against Derivium); Newton Family, LLC v. Derivium Capital LLC, No. 2:07-cv-02964 (D.S.C. Feb. 26, 2009) (jury verdict against Cathcart for $17 million); Schlacte v. United States, 102 AFTR 2d 2008-5894, 2008-2 USTC par. 50,538 (N.D. Cal. 2008) (tax refund case); WCN/GAN Partners Ltd. v. Cathcart, No. 2:05-cv-00282-J (D. Wyo., Aug. 3, 2007) (order granting motion to transfer to South Carolina); McCarty v. Derivium Capital, LLC, No. 3:03 cv 00651 MRK (D. Conn., Nov. 21, 2005) (order denying claims against American Arbitration Association).

tax shelter in violation of section 6700.[8]  The theory was that Derivium "falsely advise[d] customers that they can receive 90% of the value of their securities without paying income tax on capital gains."  The government asserted that Derivium made false statements about the tax benefits of its product, including saying that it was marketing loans with potentially indefinite deferral of tax.  The government quoted Derivium's marketing materials as saying:

> You don't have to sell your shares and trigger a tax liability (because loans are not taxable events).  In fact, depending on your individual tax situation, the 90% Stock Loan may even enable you to generate more cash than selling the position outright, net of capital gains tax liabilities.

The government alleged the total tax loss associated with Derivium's scheme to be almost $235 million, Complaint, United States v. Cathcart, No. C 07-4762 (N.D. Cal. filed Sept. 17, 2007), and won an injunction in late 2007 forbidding Derivium from continuing to market the scheme, United States v. Cathcart, No. C 07-4762 (N.D. Cal. Dec. 10, 2007) (order of permanent injunction).

Even before this last litigation loss Derivium was beginning to crater, and it had filed for bankruptcy in September 2005. Derivium said at the time that it would move under 11 U.S.C.

---

[8] Unless otherwise noted, all section references are to the Internal Revenue Code, and the single Rule reference is to the Tax Court Rules of Practice and Procedure.

section 505 for a mass determination as to whether the stock loans constituted *bona fide* loans or sales.  See Derivium Capital LLC v. United States Trustee, 97 AFTR 2d 2006-2582 (S.D.N.Y. 2006).  It never did, and borrowers were left scrambling to get their own judgments on a case-by-case basis.  The bankruptcy court appointed a trustee to oversee the disposition of Derivium's assets, and the case was transferred to South Carolina.  Many of the claims that had been filed against Derivium and Cathcart in the years before the bankruptcy eventually ended up before the bankruptcy court.

As the bankruptcy went forward, the trustee uncovered what he deemed a "Ponzi scheme."  Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital, LLC), 396 Bankr. 184, 188 (Bankr. D.S.C. 2008).  He also alleged that Cathcart and Derivium's other owners had illegally shifted assets out of Derivium into shell corporations to avoid bankruptcy liquidation. Campbell v. Cathcart (In re Derivium Capital, LLC), 380 Bankr. 429, 435-36 (Bankr. D.S.C. 2006).

In an action for a permanent injunction and equitable relief against the Cathcarts, Debevc, Nagy, and Derivium, the Northern District of California granted summary judgment for the government, finding that the loan transactions were "sales of securities for purposes of tax code treatment, as opposed to bona fide loans."  United States v. Cathcart, 104 AFTR 2d 2009-6625,

2009-2 USTC par. 50,658 (N.D. Cal. 2009) (order granting summary judgment and denying summary judgment and miscellaneous rulings).

## Discussion

We recently decided in another Derivium case that the transfer of stock from a customer to Derivium's control was a sale under the Code. See Calloway, 135 T.C. at ___ (slip op. at 22). We therefore hold that Shao did sell her Veritas stock in 2001, triggering the capital gain that the Commissioner and Shao agreed upon in their stipulation. The only remaining issue is whether Shao owes the accuracy-related penalty for not reporting the sale on her 2001 tax return.

The Commissioner claims that Shao's understatement was "substantial"--i.e., that it was more that $5,000 and ten percent of the tax required to be shown on her return--and therefore she should pay a twenty-percent penalty. See sec. 6662(a), (b)(2), (d)(1). But Shao tells us she shouldn't have to pay the penalty because she acted with reasonable cause and in good faith. See sec. 6664(c). This is a determination we must make on a case-by-case basis, considering all of the facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Among the facts and circumstances that we must consider is whether there was "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the

taxpayer." Id. Although Shao has a college degree, her focus was in cultural anthropology and she didn't have any investing experience before being hired at Veritas. When she entered into both of her stock transactions (the E*trade margin loan and the Derivium transaction) she did so only after consulting a certified financial planner. The Commissioner points out that Shao worked at a finance company at one point, but we note that this was around the time she was 24 years old, and between her jobs as an anthropologist at a museum and as a floating administrative assistant at Veritas. We do not, therefore, find her sophisticated in tax matters because of that one position. Shao herself began hiring tax professionals to prepare her returns as soon as she started getting stock options. When she entered the Derivium transaction the only stock loan Shao had ever entered was her E*trade margin loan, which she believed was similar to this transaction and whose legitimacy had never been questioned.

The relevant regulation also tells us that to find good faith and reasonable cause "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id. Shao sought financial advice from a trusted certified financial planner before entering the deal and also hired her to prepare the related tax returns. The returns were consistent with Shao's understanding of the transaction and

consistent with the information returns she received from third parties because she didn't get a Form 1099-B or 1099-C showing a sale of the stock or cancellation of debt.

We have also found it inappropriate to penalize taxpayers where a mistake of law was in a complicated subject area without clear guidance. Van Wyk v. Commissioner, 113 T.C. 440, 449 (1999). Calloway was a case of first impression, so there wasn't any clear direction on whether a transaction with these characteristics was a loan or a sale. While a Derivium loan might not look particularly complicated to a stock broker or tax expert, its subtle differences from Shao's E*trade margin loan and the corresponding implications for stock ownership are not (and were not to Shao) readily apparent. On the basis of her extremely limited experience, Shao believed the Derivium deal was like her margin loan. The only difference in her mind was that with Derivium she was protected from margin calls. But that difference does not create a case where it would "strain credulity to the breaking point" to say Shao didn't know something fishy was going on. Lynch v. Commissioner, 273 F.2d 867, 872 (2d Cir. 1959) (discrediting taxpayers' claims they had no inkling something unusual was happening when each had received an $80,000 unsecured, undocumented, no-interest loan from a source they hadn't met until the transaction and later obtained a second loan, this one nonrecourse and for significantly more than

the market value of the collateral at the time of the loan), affg. 31 T.C. 990 (1959) and Julian v. Commissioner, 31 T.C. 998 (1959). At the time of the transaction, Shao reasonably and in good faith thought she had received an oversecured loan. She also believed that Derivium was hedging its position so she had no reason to think it would ever be under- or unsecured.

In Calloway, 135 T.C. at ___ (slip op. at 38), we found that a taxpayer in a nearly identical transaction failed to prove a reasonable-cause and good-faith defense based upon his behavior after the transaction. Calloway treated the transaction inconsistently with his own claim that it was a loan by failing to report dividends as income during the loan term and by failing to recognize gain or income from the discharge of indebtedness upon the termination of the so-called loan. Id. at ___ (slip op. at 35). These actions are inconsistent with good faith. We also found that Calloway could not claim reasonable reliance on either of his professional advisers--Calloway didn't establish one of his adviser's credentials and the other one gave Calloway a letter from a Derivium promoter which couldn't be reasonably relied upon. Id. at ___ (slip op. at 36-38). Calloway's advisers, then, didn't provide him with reasonable cause. We also noted that Calloway admitted tax motivation for the transaction's form, which indicated that--consistent with his subsequent actions--he never truly intended it to be a loan. Id.

at ___ (slip op. at 20-21).  This, of course, also cannot be considered good faith.

In Shao's case we don't find the circumstances that led the Court to penalize Calloway--there is no evidence of a wink-wink-nudge-nudge-say-no-more arrangement with Derivium.  See Monty Python's Flying Circus: How To Recognise Different Types of Trees From Quite a Long Way Away (BBC1 television broadcast Oct. 19, 1969).  Shao had legitimate, nontax motivations for wanting to structure her deal as a loan instead of a sale--she wanted to reduce risk and use some of the stocks' value without selling her nest egg.  Her naivete, but not (we expressly find) her negligence, is especially prominent in her renewal of the loan at a steep price after three years.  Unlike Calloway, Shao treated her transaction like a loan throughout its existence, proving her good faith.

We therefore find that Shao acted in good faith upon an honest misunderstanding of the law that was reasonable in her circumstances.  She has proven her defense to the accuracy-related penalty.

Decision will be entered under Rule 155.