T.C. Memo. 2012-98

UNITED STATES TAX COURT

ROY ZELUCK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10393-09.                          Filed April 3, 2012.

P invested $310,000 in an oil and gas partnership in 2001; $110,000 of the investment was made in cash, and $200,000 was made by a subscription note maturing Dec. 31, 2009. The partnership used P's and other investors' notes as security on a turnkey note it wrote to a drilling company. P signed an assumption agreement which made him personally liable on the turnkey note up to the amount of liability on his subscription note.

As a result of costs the partnership incurred, P claimed deductions for 2001 and 2002 which reduced his capital account balance from $310,000 to $32,407. In 2003 the partnership terminated and distributed $32,407 to P. P has not made payments of principal on the $200,000 subscription note and has failed to meet certain other requirements of the subscription agreement for interest payments. R issued a notice of deficiency which determined that P's liability on the subscription note and related assumption agreement became nongenuine in 2003 and that P must recognize $200,000 in income

for 2003 as a result. P claims that if no liability existed in 2003 that no liability existed in 2001 either and R would be precluded from contesting P's 2001 return by the expiration of the period of limitations under I.R.C. sec. 6501.

Held: P's liability on the subscription note and related assumption agreement became nongenuine in 2003.

Held, further, P must recognize a $200,000 gain for 2003 under I.R.C. sec. 465(e).

Held, further, P is liable for an accuracy-related penalty under I.R.C. sec. 6662(a).

N. Jerold Cohen, Matthew J. Gries, and Sheldon M. Kay, for petitioner.

Marion S. Friedman, Melanie R. Urban, and Derek B. Matta, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: Respondent determined a deficiency in petitioner's Federal income tax of $135,100 for tax year 2003 as a result of: (1) the determination that a debt petitioner owed became nongenuine in 2003 and the effect on his investment in an oil and gas partnership; and (2) the disallowance of a deduction resulting from a historic preservation easement donation. Respondent also

determined an accuracy-related penalty under section 6662(a) and (h)[1] of $14,420

and $25,200, respectively.

The historic preservation easement issue and related section 6662(h) penalty

were tried separately. The issues remaining for decision are:[2]

(1) whether petitioner must recognize a $200,000 gain for 2003 under the

subchapter K rules or section 465(e). We hold that he must recognize the gain

under section 465(e); and

(2) whether petitioner is liable for a 20% accuracy-related penalty under

section 6662(a). We hold that he is.

## FINDINGS OF FACT

At the time the petition was filed, petitioner resided in New York.

I. Petitioner's Investment in PW Partnership

Petitioner and his brother, Kevin Zeluck, are each 50% owners of Zeluck,

Inc., a 90-year-old family business which manufactures custom doors and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that alternative argument set forth in the notice of deficiency under sec. 446.

windows. Petitioner handles sales and research and development for Zeluck, Inc. Petitioner and Kevin Zeluck often invest in similar ventures together.

PW & F-W-01 Drilling Co. (PW Partnership) was formed August 1, 2001, purportedly for the purposes of: (1) investing in the acquisition, development, and drilling of oil and gas leases; (2) acquiring oil and gas leases developed and operated by other oil and gas companies; and (3) producing and selling hydrocarbons. Kevin Zeluck learned of the possibility of investing in PW Partnership from his longtime friend, Perry Weitz, and discussed the investment with petitioner. Both Kevin Zeluck and petitioner invested in PW Partnership in 2001 and became general partners. The following people acquired interests in PW Partnership:

| Partner | Percentage interest |
| --- | --- |
| Perry Weitz | 81.5217391 |
| Arthur Luxenberg | 8.1521739 |
| Robert Schoenhaut | 0.8152174 |
| Richard Siegal | 6.1141304 |
| Gail Siegal | 0.6793478 |
| Kevin Zeluck | 1.3586957 |
| Roy Zeluck | 1.3586957 |

Petitioner invested a total of $310,000 in PW Partnership. Of the $310,000, $110,000 was in cash and the remaining $200,000 was in the form of a promissory note (subscription note).

## II. The Subscription Notes

In making his investment in PW Partnership, petitioner signed a $200,000 subscription note in favor of PW Partnership on December 10, 2001. The subscription note had a 0.5% annual interest rate through December 31, 2001, after which date the interest rate increased to 8% per annum. The subscription note provided that interest before 2002 would accrue. The subscription note further provided:

> Interest from January 1, 2002 through December 31, 2002 will be paid quarterly by * * * [petitioner] to the Partnership; and commencing the following year beginning January 1, 2003, such interest will be payable from * * * [petitioner's] share of the Partnership's net operating revenues. To the extent such revenues are not available or are insufficient, such unpaid interest shall accrue. * * * Twenty-five percent (25%) of * * * [petitioner's] share of the Partnership net operating revenues after the payment of interest shall be applied in payment of the outstanding principal balance of this Note.

Any accrued interest and the remaining principal balance were to become due in full on December 31, 2009. Should the subscription note not be paid in full when due, the remaining balance of principal and accrued interest would carry an annual interest rate of 15%. As collateral for the payment of the subscription note, petitioner granted PW Partnership a security interest in his interest in PW Partnership and his rights to the production and proceeds from PW Partnership's

wells (described further infra).  Petitioner properly made four payments of $4,000 on the subscription note in 2002, thus paying all interest accruing in that year.

Subscription notes were signed by other partners investing in PW Partnership, including Kevin Zeluck, Mr. Schoenhaut, Mr. Luxenberg, and Mr. Weitz.  These subscription notes had terms similar to the subscription note petitioner signed; however, the amounts of the notes varied with the size of each payor's interest in PW Partnership.

## III.  Richard Siegal's Organization and Relationship to PW Partnership

Richard Siegal had participated in the oil and gas business since the 1970s. He had a large operation that was involved in the drilling of approximately 3,000 wells which produced over 1 trillion cubic feet of gas and 125 million barrels of oil. Mr. Siegal's tax returns and the returns of various entities he owned or operated had been audited by tax authorities (including the New York Department of Taxation and Finance and the Internal Revenue Service) many times over his career with no material changes made to the returns.  While it was proven that PW Partnership's 2001 tax return was audited by the New York Department of Taxation and Finance, it was not established whether any other audits of PW Partnership's returns took place.  The New York Department of Taxation and Finance described the audit of PW Partnership's 2001 tax return as "limited".

PW Partnership was one of the entities owned or organized by Mr. Siegal. Those entities included Palace Exploration Corp. (Palace Exploration), Vail Drilling Co. (Vail Drilling), BiState Oil Management Corp. (BiState Oil Management), and BiState Oil Distribution Corp. (BiState Oil Distribution). BiState Oil Management provided general administrative services for all of the entities Mr. Siegal owned or operated, including PW Partnership. BiState Oil Distribution received revenue checks for oil and gas interests owned by other entities associated with Mr. Siegal, including PW Partnership. BiState Oil Distribution also wrote the operating revenue distribution checks to the partners of PW Partnership (described further infra).

PW Partnership and Palace Exploration entered into an agreement (prospect agreement) whereby PW Partnership would pay $370,000 to receive an interest in certain well prospects Palace Exploration owned. PW Partnership also entered into a turnkey drilling contract with Vail Drilling. According to the turnkey drilling contract, Vail Drilling agreed to begin drilling on well prospects in which PW Partnership owned an interest by the end of 2001.

In exchange for providing drilling services, Vail Drilling received $22,440,000 from PW Partnership, $7,720,000 in cash and $14,720,000 in the form of a promissory note written by PW Partnership in favor of Vail Drilling

(turnkey note). The turnkey note carried the same payment terms and December 31, 2009, maturity date as the subscription notes except no interest was required to be paid on the turnkey note during 2002. The turnkey note was secured by the subscription notes payable to PW Partnership, all collateral securing the subscription notes, and the contract between Vail Drilling and PW Partnership.

Pursuant to the turnkey drilling contract and the turnkey note, PW Partnership provided the subscription notes from each partner as collateral for the turnkey note, as well as any interests PW Partnership held in the well prospects or well production. In addition, petitioner, Kevin Zeluck, Mr. Weitz, Mr. Luxenberg, and Mr. Schoenhaut each entered into a separate assumption agreement with Vail Drilling by which they assumed their pro rata shares of the turnkey note according to the percentage interests they held in PW Partnership. The amounts of the individual liabilities could not exceed the amounts due under each partner's individual subscription note (including accrued interest). The subscription notes and assumed liabilities on the turnkey note were coterminous liabilities; when a partner made a payment on the subscription note liability, both liabilities were reduced by the amount of the payment. The same security interests granted to PW Partnership in the subscription notes were granted to Vail Drilling as collateral for the assumption agreements.

IV.  <u>Perry Weitz, Robert Schoenhaut, and PW Partnership's Management</u>

Mr. Weitz was a senior partner at the law firm of Weitz & Luxenberg, a law firm that specializes in mass tort litigation.  Mr. Schoenhaut is a certified public accountant with a degree in accounting and an M.B.A. in finance.  He is Mr. Weitz's brother-in-law and has served as comptroller for the Weitz & Luxenberg law firm for 12 years.

Mr. Weitz began investing in Mr. Siegal's business entities in the 1990s.  Mr. Weitz invested millions of dollars in 18 oil and gas partnerships organized by Mr. Siegal between 1996 and 2005, one of which was PW Partnership.  Before making his investments, Mr. Weitz learned that Mr. Siegal's returns and the returns of his business entities had been audited by tax authorities many times, with no resulting material changes made.  Mr. Weitz also sent Mr. Schoenhaut to make sure wells were being drilled and to otherwise investigate Mr. Siegal's business entities before investing.

After his initial investigation on behalf of Mr. Weitz, Mr. Schoenhaut began referring people to invest in organizations Mr. Siegal formed.  Mr. Schoenhaut used his resulting referral fees (as well as a subscription note) to purchase a 0.8152174% interest in PW Partnership.  Despite having only one year of prior

experience in the oil and gas industry (gained earlier in his career), Mr. Schoenhaut was made the managing partner of PW Partnership.

The PW Partnership agreement vested full and exclusive power and authority in the managing partner to manage, control, administer, and operate the business affairs of PW Partnership by operating properties, purchasing insurance, purchasing or leasing equipment, acquiring leases or mineral rights, making decisions with respect to which oil and gas properties to acquire, and handling partnership funds. The PW Partnership agreement also provided that the other partners could take no part in the management of PW Partnership or transact any business for it.

Mr. Schoenhaut did not fulfill his responsibilities as managing partner. He did not run the operations of PW Partnership or manage any of PW Partnership's finances. He did not have signature authority over PW Partnership's accounts and could not account for what was done with the cash contributions of the other partners. However, he did sign certain contracts on behalf of PW Partnership. These contracts included the prospect agreement with Palace Exploration, the turnkey drilling contract with Vail Drilling, and the turnkey note in favor of Vail Drilling. Mr. Schoenhaut did not participate in the drafting of these documents, nor did he negotiate their terms. Mr. Schoenhaut did not know whether the

$22,440,000 to be paid to Vail Drilling for drilling wells in which PW Partnership owned an interest was reasonable and was not capable of making such a decision.

Mr. Siegal and his entities managed PW Partnership in place of Mr. Schoenhaut. They selected PW Partnership's drilling prospects and determined the disbursements of the production revenues. The secretary for BiState Oil Management and Palace Exploration signed all checks and handled all of the banking for PW Partnership at Mr. Siegal's direction.

V.  Termination of PW Partnership

PW Partnership terminated January 2, 2003. PW Partnership's tax return for 2003 showed no activity except liquidation of all assets and final distributions made to the partners. The means of the liquidation and where PW Partnership's noncash assets ended up was not established.

The reasons for the termination of PW Partnership are not clear, and some partners (including petitioner, Mr. Weitz, and Mr. Luxenberg) were not made aware of the termination until this case began. Mr. Schoenhaut did not participate in the decision to terminate PW Partnership and did not become aware of the termination until 2004 at the earliest. Upon learning of PW Partnership's termination, Mr. Schoenhaut took no action with respect to the assets of PW Partnership and did not ask Mr. Siegal what was going to happen to the assets. He

does not know what happened to them after PW Partnership's termination.

Petitioner does not know who holds his subscription note or assumption agreement.

The PW Partnership agreement provides that upon termination PW Partnership would be required to pay all of its debts and distribute remaining assets to the partners. However, no payments were made on the turnkey note upon PW Partnership's termination. Instead of paying down the turnkey note, PW Partnership distributed $2,385,279 to the partners. After PW Partnership's termination the partners continued to receive net operating revenue distribution checks from BiState Oil Distribution.

VI. Petitioner's Receipt of Net Operating Revenue Distributions From PW Partnership and Payments on Petitioner's Subscription Note

From 2002 to 2010 petitioner received net operating revenue distributions as a result of his investment in PW Partnership. Petitioner received one distribution in 2002, four distributions in 2003, and three or four distributions in all other years. The total amount of petitioner's net operating revenue distributions received was $59,818.48. Petitioner's received distributions (after accounting for withholdings) by year were:

| Year | Distribution |
|------|-------------|
| 2002 | $2,554.66 |
| 2003 | 10,067.21 |
| 2004 | 9,278.90 |
| 2005 | 9,823.59 |
| 2006 | 9,713.97 |
| 2007 | 7,826.19 |
| 2008 | 7,889.37 |
| 2009 | 1,626.96 |
| 2010 | 1,037.63 |

Five interest payments related to petitioner's subscription note were made through amounts withheld from net operating revenue distributions, as follows:

| Date | Check amount | Interest | Total |
|------|-------------|----------|-------|
| 4/28/03 | $2,503.59 | $1,263.59 | $3,767.18 |
| 7/28/03 | 2,509.51 | 951.09 | 3,460.60 |
| 10/29/03 | 2,503.61 | 434.78 | 2,938.39 |
| 1/29/04 | 2,501.98 | 1,399.46 | 3,901.44 |
| 1/30/06 | 2,512.70 | 869.57 | 3,382.27 |

No principal payments had been made on petitioner's subscription note before trial, either through withholdings from net operating revenue distributions or otherwise.

VII. Advice Petitioner Received Before Investing in the Partnership and Petitioner's Tax Returns

At the time of his investment in PW Partnership, petitioner received a package of documents pertaining to the investment which included the PW

Partnership agreement, the subscription note, the assumption agreement, the turnkey note, and the prospect agreement. Petitioner consulted with the certified accounting firm Ross & Strent, with whom he had a longstanding relationship as a result of work Ross & Strent did for Zeluck, Inc. Although Ross & Strent approved of the investment, petitioner did not receive a written opinion from them. No one from Ross & Strent was called to testify at trial.

Mr. Weitz shared all of the information he learned, including his knowledge of the previous successful tax audits of the returns of Mr. Siegal's business entities, with Kevin Zeluck before Kevin Zeluck and petitioner decided to invest in PW Partnership. Petitioner discussed this information, their accountants' advice, and other aspects of the investment with Kevin Zeluck before becoming a partner in PW Partnership. Petitioner did not otherwise investigate PW Partnership before investing in it.

Ross & Strent prepared petitioner's tax returns for 2001, 2002, and 2003. On his 2001 return petitioner claimed a $275,045 nonpassive, ordinary loss deduction resulting from his investment in PW Partnership, consisting of a deduction for intangible drilling costs of $274,996 and an ordinary loss of $49. As a result of this deduction and his $310,000 investment, PW Partnership's tax return

for 2001 reported petitioner's capital account balance as $34,955 as of the end of 2001.

On his 2002 return petitioner reported interest income of $16,000 and a nonpassive, ordinary loss deduction of $15,993 as a result of his investment in PW Partnership. The $15,993 loss consisted of a deduction for intangible drilling costs of $2,940 and an operating loss of $13,053. As a result of these items and the $2,555 in net operating revenue distributed to petitioner in 2002, PW Partnership's corporate return for 2002 reported petitioner's capital account balance as $32,407 as of the end of 2002.

Upon terminating in 2003 PW Partnership distributed $32,407 to petitioner, eliminating the opening balance reported for his capital account for 2003. Petitioner failed to report this distribution on his 2003 income tax return.

VIII. Other Information

Petitioner, Kevin Zeluck, Mr. Luxenberg, Mr. Weitz, and Mr. Schoenhaut all testified that they were liable under the subscription notes when they signed them in 2001.

Petitioner is not aware of the person or entity to whom he would currently be liable for payment on his subscription note, has never received any written notification of the balance due on his subscription note, has made no inquiry

regarding the balance due, and has made no arrangements to pay the balance due. No demand for payment has ever been made by any party as a result of the partners' subscription notes, even after December 31, 2009. Petitioner has never signed an extension of the subscription note or otherwise pushed back the maturity date. Petitioner, Mr. Schoenhaut, and Mr. Weitz each testified that no one had ever indicated to them that they were relieved of their liabilities under the subscription notes and assumption agreement. Petitioner testified that if he then had to write a check to cover the $200,000 in principal plus accrued interest on the subscription note it "would be a ridiculously large check" for him to write.

On February 2, 2009, respondent issued a notice of deficiency to petitioner for tax year 2003. Petitioner timely filed a petition contesting the deficiency and penalty.

## OPINION

### I. Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); INDOPCO, Inc. v.

Commissioner, 503 U.S. 79, 84 (1992). Petitioner has not argued that respondent bears the burden of proof with respect to the issues discussed below.

II. Whether Petitioner's Liability Under the Subscription Note and Assumption Agreement Became Nongenuine in 2003

In support of his position that petitioner failed to recognize a $200,000 gain for 2003, respondent argues that petitioner had no liability under the subscription note and assumption agreement in 2003.[3] Petitioner argues that: (1) he was still liable under the subscription note and assumption agreement in 2003; and (2) if we find that he was not so liable in 2003, then he was never liable under the subscription note and assumption agreement. If petitioner was never liable, he claims that respondent cannot win because respondent's theory of the case relies on the claim that the debts became nongenuine in 2003, because the expiration of the period of limitations under section 6501 precludes respondent from contesting petitioner's 2001 income tax return. Respondent acknowledges that the period of limitations with respect to petitioner's 2001 return has run.

---

[3]Respondent did not argue that petitioner had forgiveness of indebtedness income in 2003. We deem this issue waived by respondent. See Muhich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (issues not addressed or developed are deemed waived--it is not the Court's obligation to research and construct the parties' arguments), aff'g T.C. Memo. 1999-192.

We find that petitioner's liability under the subscription note and related assumption agreement was genuine in 2002 and became nongenuine in 2003. In reaching our finding, we compare the genuineness of the subscription note and coterminous assumption agreement debt in 2001 and 2002 with its genuineness in 2003. As the subscription note was not signed until December 10, 2001, and no other significant facts occurred in that year, our inquiry focuses on years 2002 and 2003.

Courts have considered various factors in determining whether a genuine indebtedness exists, including: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the debt; and (7) whether the parties conducted themselves as if the debt was genuine.[4] Calloway v. Commissioner, 135 T.C. 26,

---

[4]Use of these factors in determining whether a debt is genuine in each of two or more years is consistent with the caselaw test for forgiveness of indebtedness income. See Jones v. Commissioner, T.C. Memo. 1997-400 ("The forgiveness of an indebtedness is deemed to have occurred when it becomes reasonable to assume that the debt will probably never be paid.") (citing Exch. Sec. Bank v. United States, 492 F.2d 1096, 1099 (5th Cir. 1974), Bear Mfg. Co. v. United States, 430 F.2d 152, 154 (7th Cir. 1970), Fidelity-Philadelphia Trust Co. v. Commissioner, 23 T.C. 527,

(continued...)

37 n. 10 (2010). No one factor is necessarily determinative, and the factors considered do not constitute an exclusive list; it is appropriate to take into account the substance and realities of the financing arrangements presented to us. Id. at 37; Melvin v. Commissioner, 88 T.C. 63, 76 (1987), aff'd, 894 F.2d 1072 (9th Cir. 1990). We consider each factor for both 2002 and 2003, as well as additional facts pertaining to the arrangement in this case.

A. Whether the Promise To Repay Was Evidenced by a Note or Other Instrument

Petitioner signed both the subscription note and the assumption agreement. Although no evidence or testimony was presented which established what became of the physical note and agreement after the termination of PW Partnership, we find their existence is evidence of genuine debt existing in both 2002 and 2003.

B. Whether Interest Was Charged

Annual interest of 8% was charged on the subscription note in both 2002 and 2003. We find this is evidence of genuine debt existing in both years.

---

[4](...continued)
530 (1954), and Estate of Marcus v. Commissioner, T.C. Memo. 1975-9), aff'd without published opinion, 177 F.3d 983 (11th Cir. 1999).

C.  <u>Whether a Fixed Schedule for Repayments Was Established</u>

Petitioner was required to make quarterly interest payments of $4,000 in 2002, but not in 2003.  Beginning in 2003, interest payments were to be made out of withholdings from PW Partnership net operating revenue distributions (and accrue to the extent the withholdings were insufficient to cover the interest).  We find this is evidence of genuine debt existing in both years.  However, because of the uncertainty whether the net operating revenue distributions would be sufficient to cover all interest in 2003, we find this factor is somewhat weaker evidence of the existence of a genuine debt in 2003.

In addition, we also consider that 25% of petitioner's share of net operating revenues (after the payment of interest) was to be used to pay down his outstanding principal balance on the subscription note (and assumption agreement).  We find this schedule is evidence of the existence of genuine debt in both 2002 and 2003.  However, we note the schedule was not strictly adhered to (especially in 2003 and the years after), a fact further discussed <u>infra</u>.

D.  <u>Whether Collateral Was Given To Secure Payment</u>

As collateral for the payment of the subscription note, petitioner granted PW Partnership a security interest in his interest in PW Partnership and his rights to the production and proceeds from PW Partnership's oil and gas wells.  These same

security interests were granted to Vail Drilling as collateral for the assumption agreement. In addition, the turnkey note between PW Partnership and Vail Drilling was secured by: (1) the subscription notes payable to PW Partnership; (2) any collateral securing the subscription notes; and (3) the contract between Vail Drilling and PW Partnership. We find the existence of collateral is evidence of the existence of genuine debt in both 2002 and 2003.

E. Whether Repayments Were Made

Petitioner made the required $16,000 in interest payments in 2002. However, petitioner did not pay down principal in 2002 even though a net operating revenue distribution was made to him in 2002. The terms of the subscription note (and assumption agreement) required that 25% of net operating revenue distributions (after the payment of interest) be used to pay down principal. As the amount of the 2002 distribution was $2,554.66, petitioner failed to pay a required amount of $638.67 in 2002. We find this reflects mixed evidence of whether genuine debt existed in 2002. While petitioner successfully made his $16,000 in interest payments, one required principal payment of $638.67 was not made.

Fewer required repayments were made beginning in 2003. In 2003 interest payment of only $2,649.46 were made, all of which were the result of

withholdings from net operating revenue distributions made to petitioner. Despite the withheld interest payments covering only approximately 17% of the $16,000 in interest which would either need to be paid or accrue in 2003, petitioner still received distributions totaling $10,067.21 in 2003. This trend of failure to withhold the required interest worsened in the years after 2003; only one (insufficient) interest withholding was made in both 2004 and 2006. No interest withholdings were made in other years.

In addition to fewer interest payments being made in 2003, terms of the subscription note relating to principal repayment through withholdings from net operating revenue distributions were violated. No withholdings were paid toward principal from any of the four distributions petitioner received in 2003, even though he received distributions totaling $10,067.21 in that year. Failure to pay down principal through withholdings continued in all subsequent years.

Another required payment was not made on the turnkey note by PW Partnership in 2003 (which would have reduced petitioner's liability under the assumption agreement). The PW Partnership agreement provides that upon termination PW Partnership would be required to pay all of its debts and distribute remaining assets to the partners. However, no payments were made on the turnkey note upon PW Partnership's termination and liquidation. Instead of paying down

the turnkey note, PW Partnership distributed $2,385,279 to the partners, including $32,407 to petitioner.

In 2003 there was a failure to properly repay the required interest and principal on the subscription note and assumption agreement through withholding on distributions to petitioner, as well as a failure by PW Partnership to pay down the turnkey note upon termination. We find these facts are strong evidence that no genuine debt existed in 2003.

F. Whether the Borrower Had a Reasonable Prospect of Repaying the Loan

Petitioner testified at trial that if he then had to write a check to cover the $200,000 in principal plus accrued interest it "would be a ridiculously large check" for him to write. However this was in October 2010, after many years of interest accrual and compounding. No evidence was specifically presented detailing petitioner's ability to pay the liabilities as they existed in 2002 and 2003. However, we do note that petitioner was able to obtain $110,000 in cash to invest in PW Partnership in 2001 and was able to make $16,000 in required interest payments in 2002. We also consider that had proper withholdings been made from petitioner's net operating revenue distributions, a small principal payment would have been made in 2002 and approximately 80% of the interest would have been paid in 2003. Taking into account compounding of interest, such payments in 2002

and 2003 could have had a great effect on petitioner's ability to pay off the subscription note/assumption agreement debt upon maturity at the end of 2009. We find these facts are neutral evidence of the existence of genuine debt in both 2002 and 2003.

G. Whether the Parties Conducted Themselves as if the Debt Was Genuine

With the exception of the failure to withhold $638.67 from the single net operating revenue distribution petitioner received in 2002 to be paid toward principal, the parties otherwise conducted themselves as if the subscription note and assumption agreement liabilities were genuine debt in 2002. Petitioner paid $16,000 in required interest and the relationship between petitioner, PW Partnership, and Vail Drilling was not disrupted. We find these facts are evidence of the existence of genuine debt in 2002.

In 2003 multiple failures to make withholdings from petitioner's net operating revenue distributions occurred totaling $10,067.21 (the total amount of the distributions petitioner received, all of which should have been withheld). In addition, although the relationship between petitioner, PW Partnership, and Vail Drilling was severely disrupted in 2003 as a result of PW Partnership's termination and liquidation, no resulting action was taken by Vail Drilling to ensure it would be repaid by PW Partnership or its partners.

Although proper withholdings were not being made out of petitioner's net operating revenue distributions to pay down interest or principal owed to Vail Drilling under the assumption agreement, Vail Drilling did not seek to obtain ownership of the collateral securing petitioner's assumption agreement. This collateral included petitioner's rights to the production and proceeds from PW Partnership's wells. Instead of obtaining possession of the collateral or otherwise seeking to enforce required payments, Vail Drilling did nothing.

In addition to Vail Drilling's not acting as though the assumption agreement liability was genuine in 2003, PW Partnership did not act as though the turnkey note was a genuine debt in 2003 (which reflects on the genuineness of the related assumption agreement). Upon its termination and liquidation, PW Partnership ignored a provision in its partnership agreement requiring liabilities to be paid first upon liquidation. Instead of paying down the turnkey note, PW Partnership distributed the proceeds of the liquidation to its partners, including petitioner.

We also note that neither PW Partnership or Vail Drilling notified the partners of PW Partnership of its termination and that the partners would have to make payments under the subscription notes to a different entity as a result. Indeed, most of the partners of PW Partnership did not find out about the termination until they were notified of this case. At trial petitioner was unaware

who held his debt or to whom he would make payments on that debt. We find these facts are strong evidence that no genuine debt existed in 2003.

  H.  Conclusions Regarding the Subscription Note and Assumption
      Agreement Liabilities in 2002 and 2003

After considering each of the above seven factors, we find the subscription note/assumption agreement debt was a genuine debt of petitioner's at the end of 2002. We also find the debt became nongenuine in 2003, and petitioner was not liable for the debt as of the end of that year. We find that the subscription note and assumption agreement liabilities were genuine debts in 2002 but were not genuine debts in 2003. Our conclusion turns primarily on the lack of payments made and enforcement sought after the termination and liquidation of PW Partnership at the beginning of 2003.

We also note that additional facts support our conclusion that the debt became nongenuine in 2003. No demand for payment was made by any party upon the subscription note maturity date of December 31, 2009, and petitioner had made no arrangements to pay the balance due as of the time of trial, even though the amount due was allegedly accruing interest at 15%.[5] To the extent petitioner

---

[5]It also appears that petitioner would not be able to pay the balance due under the note as of the time of trial, testifying that it "would be a ridiculously large check" for him to write.

claims the subscription note and related assumption agreement still represented genuine debts at the time of trial, we do not agree. Furthermore, taking into account the testimony of petitioner, Kevin Zeluck, Mr. Luxenberg, Mr. Weitz, and Mr. Schoenhaut that they were liable under the subscription notes when they signed them in 2001 as well as other facts relating to petitioner's payments made on his subscription note in 2002, discussed supra pp. 19-26, we also reject petitioner's alternative claim that he was never liable on the subscription note and related assumption agreement.

Petitioner has testified and the evidence shows that his subscription note/assumption agreement debt was genuine when entered into in December 2001. In addition, the evidence shows the subscription note/assumption agreement debt was no longer genuine as of the time of trial in October 2010. It follows that at some point between these two dates the debt became nongenuine. Given the facts previously discussed relating to termination of PW Partnership and lack of principal and interest payments made in 2003, see supra pp. 19-26, we find 2003 was the year in which the debt became nongenuine.

III. <u>Whether Petitioner Must Recognize a $200,000 Gain for 2003 Under Section</u>
     <u>465(e)</u>

Respondent claims that petitioner's amount at risk in PW Partnership was

reduced from $310,000 in 2001 to zero upon PW Partnership's termination in 2003

as a result of partnership losses flowing through to petitioner as well as distributions

made to petitioner. Respondent argues that petitioner's amount at risk was then

further reduced by $200,000 in 2003 as a result of his $200,000 debt under the

subscription note and assumption agreement becoming nongenuine. This would

result in petitioner's amount at risk becoming negative $200,000, requiring him to

report a $200,000 gain for 2003 under section 465(e).

Petitioner does not dispute that his amount at risk in PW Partnership was

reduced to zero upon the $32,407 distribution's being paid to him after PW

Partnership's liquidation in 2003. However, petitioner argues that section 465(e) is

inapplicable because there was no change in his liability under the subscription note

in 2003. In support of his argument, petitioner claims that either: (1) the

subscription note and assumption agreement liabilities were genuine debts during

2003; or (2) if the subscription note and assumption agreement liabilities were not

genuine debts during 2003, they were never genuine.

When an individual is engaged in certain activities, section 465(a) limits the losses that an individual may claim as deductions to the amount for which the individual is at risk in the activity. Section 465(a) applies to taxpayers engaged in the activity of exploring for, or exploiting, oil and gas resources as a trade or business or for the production of income. Sec. 465(c)(1)(D). Section 465(b)(1) provides that a taxpayer is considered at risk for an activity with respect to the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and for certain amounts borrowed with respect to the activity. Section 465(b)(2) provides that a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he is personally liable for the repayment of such amounts. Finally, section 465(e) provides that if zero exceeds the amount for which the taxpayer is at risk in any activity at the close of any taxable year the taxpayer shall include in his gross income for such taxable year an amount equal to the excess.

Petitioner first argues that he was at risk for $200,000 in 2003 as a result of the subscription note and assumption agreement. However, we have already found that petitioner was not liable on the subscription note or assumption agreement in 2003. See supra pp. 17-27. We therefore reject this argument.

Petitioner next argues that if he was not at risk for $200,000 in 2003, he was never at risk for $200,000 as a result of the subscription note and assumption agreement and therefore section 465(e) does not apply. We have held that section 465(e) "applies only where the debtor genuinely was at risk during the stated recourse period, not to promissory notes * * * with respect to which the makers were never genuinely at risk." Porreca v. Commissioner, 86 T.C. 821, 842 (1986). However, we have already found that although petitioner was not liable on the subscription note or assumption agreement in 2003, he was previously liable on these debts in 2002. See supra pp. 17-27. The subscription note/assumption agreement obligation were thus included in petitioner's at-risk amount in 2002. See Melvin v. Commissioner, 88 T.C. at 73-74 (obligations due in later years may be included in the computation of a partner's at-risk amount if the partner is personally liable on the obligation). We therefore reject petitioner's argument.

Petitioner was initially at risk for $310,000 in PW Partnership and reduced his risk to zero in 2003 as a result of receiving flowthrough losses and distributions totaling $310,000.[6] After he had reduced his amount at risk to zero, his liability for $200,000 of his original amount at risk became nongenuine. This

---

[6]These flowthrough losses and distributions were from years 2001, 2002, and 2003.

lowered his amount at risk to negative $200,000 in 2003. <u>See</u> sec. 465(b)(2). We therefore hold that petitioner must recognize a $200,000 gain for 2003 pursuant to section 465(e).

## IV. Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, negligence or disregard of rules or regulations or a substantial understatement of income tax. The penalty is 20% of the portion of the underpayment of tax to which the section applies. Sec. 6662(a).

Respondent determined that petitioner was liable for the accuracy-related penalty under section 6662(b)(1) for negligence or disregard of rules and regulations, or in the alternative, under section 6662(b)(2) for a substantial understatement of income tax. Petitioner claims no penalty is appropriate because: (1) he was not negligent and did not disregard any rules or regulations; (2) there was substantial authority supporting his tax treatment of his investment in PW Partnership and thus it was not a tax shelter under section 6662(d); and (3) he acted with reasonable cause and good faith.

The Commissioner bears the burden of production on the applicability of an accuracy-related penalty in that he must come forward with sufficient evidence

indicating that it is proper to impose the penalty. <u>See</u> sec. 7491(c); <u>see also</u> <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Once the Commissioner meets this burden, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate because of reasonable cause and good faith. <u>See</u> <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447. The facts of this case lead us to conclude that respondent has met his burden of production with respect to the accuracy-related penalty.

A. <u>Whether Petitioner Was Negligent or Disregarded Rules or Regulations</u>

Section 6662(c) provides that the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard. Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to rules or regulations. Sec. 1.6662-3(b)(2), Income Tax Regs. Disregard of rules or regulations is reckless if the taxpayer makes little or no effort to determine whether a rule or regulation exists. <u>Id.</u> Disregard of rules or regulations is intentional if the taxpayer has knowledge of the rule or regulation that he disregards. <u>Id.</u>

Considering the facts, we find that petitioner was negligent and at least carelessly disregarded rules in failing to properly reduce his amount at risk in PW Partnership upon his liabilities' under the subscription note and assumption agreement being discharged in 2003.

B. <u>Whether There Was Substantial Authority Supporting Petitioner's Tax Treatment of His Investment in PW Partnership</u>

Section 6662(d)(2)(B)(i) provides that the amount of an understatement shall be reduced by the portion of the understatement which is attributable to the tax treatment of any item by the taxpayer if there is substantial authority for such treatment. Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Considering the facts and law, we find petitioner did not have substantial authority for his treatment of his amount at risk in PW Partnership. Petitioner clearly ran afoul of section 465 when he failed to reduce his amount at risk in PW Partnership by $200,000 upon his liabilities' under the subscription note and assumption agreement being discharged in 2003.

C.  Whether Petitioner Acted With Reasonable Cause and Good Faith

Pursuant to section 6664(c), the 20% accuracy-related penalty of section 6662(a) does not apply to any portion of an underpayment for which a taxpayer establishes that he or she:  (1) had reasonable cause; and (2) acted in good faith. Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, his or her knowledge and experience, and the extent to which the taxpayer relied on the advice of a tax professional.  Sec. 1.6664-4(b)(1), Income Tax Regs.  We have previously held that for a taxpayer to rely reasonably upon advice so as to possibly negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove that the taxpayer meets each requirement of the following three-prong test:  (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99, aff'd, 299 F.3d 221 (3d Cir. 2002).  In addition, "Reliance may be unreasonable * * * when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known

about." Id. at 98 (citing Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994),

aff'g T.C. Memo. 1993-480).

Petitioner claims that the reasonable cause and good faith exception applies to him because he: (1) relied on the advice supplied to Kevin Zeluck by Mr. Weitz; (2) had the accounting firm Ross & Strent review the investment and prepare his tax returns; and (3) was made aware that the returns of Mr. Siegal's entities had been previously audited by tax authorities, including the IRS, with no material changes made as a result.

We find it was not reasonable for petitioner to rely on any advice provided to him by Mr. Weitz. Petitioner produced no evidence that Mr. Weitz, a member of a mass tort litigation law firm, was a competent tax professional whom it was reasonable for him to rely upon. In addition, Mr. Weitz had a conflict of interest with regard to the businesses of Mr. Siegal, as Mr. Weitz had invested millions of dollars with such businesses (including PW Partnership, of which Mr. Weitz owned over 80%) since 1996. Even if petitioner was not actually aware of Mr. Weitz's conflict of interest, he offered no evidence that he made reasonable attempts to discover it after Mr. Weitz told Kevin Zeluck of the investment opportunity. Because petitioner failed to independently verify the information he received from a

conflicted source, his reliance on the information Mr. Weitz provided was not reasonable.[7]

Petitioner claims that he relied on the advice of Ross & Strent both in deciding to invest in PW Partnership in 2001 and in filing his 2003 income tax return. We do not believe the advice petitioner received from Ross & Strent in 2001 is relevant. The issue in this case is whether petitioner failed to reduce his amount at risk in PW Partnership when the subscription note and assumption agreement liabilities became nongenuine in 2003, not whether the initial investment in PW Partnership was proper. Petitioner offered no evidence that the advice he received from Ross & Strent in 2001 related to the tax treatment of the discharged liabilities in 2003.

Although petitioner did have his 2003 tax return prepared by Ross & Strent, he failed to produce any evidence that he notified Ross & Strent that his liability under the subscription note and assumption agreement was discharged in 2003 so that Ross & Strent could properly prepare his return. Indeed, it appears from the

---

[7]Any information pertaining to PW Partnership originating with Mr. Schoenhaut and passed along to petitioner through Mr. Weitz and Kevin Zeluck also suffered from a conflict of interest because, after initially investigating Mr. Siegal's business entities for Mr. Weitz in the 1990s, Mr. Schoenhaut was paid to refer investors to partnerships associated with Mr. Siegal. Mr. Schoenhaut used these referral fees to help purchase an interest in PW Partnership and was made the managing partner of PW Partnership upon its formation.

evidence that petitioner did not notify Ross & Strent of significant partnership events occurring in 2003, as evidenced by the fact that his 2003 tax return did not report the $32,407 distributed to him upon PW Partnership's termination.  Thus petitioner failed to satisfy his burden of proof to show that he provided necessary and accurate information to Ross & Strent.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99 (requiring the taxpayer to provide necessary and accurate information to any adviser).  We therefore find petitioner's reliance on Ross & Strent's advice in preparing his 2003 return did not give him reasonable cause for his failure to report income when his subscription note and assumption agreement liabilities became nongenuine.

Petitioner also argues that reasonable cause exists because of prior audits of Mr. Siegal's business entities' returns (including an audit of PW Partnership's return for its 2001 tax year by the New York Department of Taxation) which did not require material changes be made to the returns.  However, petitioner did not present evidence on the extensiveness of audit(s) into PW Partnership; indeed, the audit of PW Partnership's 2001 tax return completed by the New York Department of Taxation was described as "limited".[8]  Moreover, the issue in this case is not

---

[8]It was not established whether any other audits of PW Partnership took place.

petitioner's actual investment in PW Partnership; it is whether he failed to properly reduce his amount at risk in PW Partnership in 2003. Petitioner provided no evidence that any audits related in any way to his partner liabilities owed to PW Partnership or liabilities resulting from assumption agreements signed by the partners becoming nongenuine. We therefore find petitioner failed to satisfy his burden of proof with respect to this claim.

We finally note that although petitioner was not aware PW Partnership had terminated until the start of this case, he made no efforts to determine why he received a $32,407 distribution in 2003. Petitioner also repeatedly failed to inquire as to why proper interest and principal payments were not being withheld from the net operating revenue distributions he received. Instead of making reasonable inquiries which likely would have led him to discover that PW Partnership had been terminated, petitioner buried his head in the sand. Petitioner thus choose to ignore strong signals that his liability under the subscription note and assumption agreement had become nongenuine and that tax consequences would arise as a result.

Petitioner has not established that he had reasonable cause for his failure to properly reduce his amount at risk in PW Partnership for 2003. We therefore find that the section 6664(c) reasonable cause and good faith exception does not apply.

D.  Conclusion Regarding the Accuracy-Related Penalty

We have found that petitioner was negligent and disregarded rules in failing to reduce his amount at risk in PW Partnership for 2003.  We have also found that petitioner did not have substantial authority for his treatment of his amount at risk in PW Partnership and that the section 6664(c) reasonable cause and good faith exception does not apply.  We therefore hold that petitioner is liable for a 20% accuracy-related penalty under section 6662(a).

V.  Conclusion

We hold that petitioner must recognize a $200,000 gain for 2003 under section 465(e).  We further hold that petitioner is liable for a 20% accuracy-related penalty under section 6662(a).

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate order will be issued.